In re LESSIG CONSTRUCTION,
INC. Debtor,

LESSIG CONSTRUCTION, INC. &
Pennsylvania National Mutual
Casualty Insurance Company, Plaintiffs,

v.

SCHNABEL ASSOCIATES,
INC., Defendant.

Bankruptcy No. 84–04280K.
Adv. No. 85–0926K.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 2, 1986.

Allen B. Dubroff, Philadelphia, Pa., for plaintiff/debtor.

K. Gerard Amadio, Philadelphia, Pa., for plaintiff/Pennsylvania Nat. Mut. Cas. Ins. Co.

Henry J. Costa, Jr., Kulpsville, Pa., for defendant/Schnabel Associates, Inc.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

■ This adversarial proceeding raises certain procedural and substantive questions about the nature of a plea of setoff asserted by a defendant in a damage suit brought against it by a debtor in bankruptcy court. As to the procedural issue, we believe that it is prerequisite for the defendant, if he asserts any counterclaim arising from a pre-petition debt including a counterclaim in the nature of a setoff within the scope of 11 U.S.C. § 553, to obtain relief from the automatic stay imposed by 11 U.S.C. § 362 prior to asserting same. We also believe that setoff, per 11 U.S.C. § 553, is properly viewed as a narrow exception to the general rule against preferential treatment of creditors, and is an effective defense to a debtor's claim only if it is clearly applicable. Since the Defendant in this proceeding pleaded a setoff defense without first obtaining relief from the automatic stay and since we find that the claims which it seeks to set off against its pre-petition claims against the Debtor are post-petition claims, and may lack the requisite mutuality to permit setoff, its defense fails both procedurally and substantively. Especially in light of the rather apparent lack of merit of these defenses, we shall also award pre-judgment interest to the Plaintiffs at the legal rate.

This proceeding was commenced on October 24, 1985, by the Debtor, LESSIG CONSTRUCTION, INC. (hereinafter "the Debtor"), and PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE CONTRACT (hereinafter "the Surety"), the debtor's surety on certain subcontract performance bonds issued in connection with two (2) projects on which the Defendant, SCHNABEL ASSOCIATES, INC. (hereinafter "the Defendant"), was contractor, to recover sums allegedly due from the Defendant on these projects. Without first requesting relief from the automatic stay, the Defendant, on November 29, 1985, pleaded, *inter alia,* a counterclaim alleging damages against the Debtor in connection with work performed at a third project in the nature of setoff.

This matter was listed for trial on May 19, 1986. It is greatly to the credit of counsel for both parties that they were able to agree upon a comprehensive Stipulation of Facts, which permitted this matter to be submitted to the Court on Briefs on a "case stated" basis, rather than exhausting the resources of this Court in a trial. The Briefs were completed and filed on July 17, 1986.

Unfortunately, this briefing was completed right at the time of transition from the Honorable William A. King, Jr., to the undersigned. This case regretfully became lost in the shuffle of the change-over, and did not surface until we received a letter from counsel on October 10, 1986, advising us that, contrary to our records which failed to reveal same, the matter was under advisement by Judge King at the time of his departure.

After review of the file, we became aware of a potential procedural issue due to the fact that the Defendant had never sought nor obtained relief from the automatic stay before asserting its counterclaims against the Plaintiffs. Aware of the directive of the Third Circuit Court of Appeals in *Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.,* 682 F.2d 446 (3d Cir.1982), that we must raise this issue *sua sponte* when it comes to our attention, we ordered the parties, on October 21, 1986, to submit Supplemental Briefs on this issue on or before October 31, 1986, which both did in timely fashion. We are now prepared to make our rulings in this case.

Given the posture of the case, we are not required to make Findings of Fact. However, for the benefit of the readers of this Opinion, in which we intend to set forth several general principles on issues which recur in many cases before us, a slightly abridged version of the parties' Stipulation

438

of Facts is reproduced hereinafter, as follows:

1. [The Debtor] is a Debtor-in-Possession under Chapter 11 of the United States Bankruptcy Code having filed, on or about December 10, 1984, a Voluntary Petition for Relief with [this Court]....

3. [The Surety] is a Pennsylvania [insurance] corporation ... authorized to execute and issue construction contract surety. bonds.

4. [The] Defendant is a Pennsylvania corporation ... engaged in the business of construction contracting.

5. [This Court] has jurisdiction over this action....

A. HIGHLAND MANOR PROJECT

7. On or about December 30, 1983, [the Defendant] entered into a contract with Highland Manor Associates whereby [it] agreed to perform certain work relating to the construction of the Highland Manor Apartments.... ("Highland Manor Project")....

8. On or about January 30, 1984, [the Defendant] entered into a written subcontract agreement with [the Debtor] whereby, upon the terms and conditions stated therein, [the Debtor] agreed to perform certain work ... at the Highland Manor Project....

9. In connection with the Highland Manor Subcontract, on or about February 24, 1984, [the Debtor], as principal, and [the Surety] ... made, executed and delivered to [the Defendant], as obligee:

(a) a Subcontract Performance Bond ... and

(b) a Subcontract Labor and Material Payment Bond....

10. Pursuant to the Highland Manor Subcontract, [the Defendant] agreed, *inter alia*, to pay to [the Debtor] the sum of $210,000.00 upon [the Debtor's] completion of the work provided for in said subcontract.

11. In addition, per ... certain change orders to the subcontract ... [and requests] ... that [the Debtor] furnish certain additional labor and/or materials in connection with the operation and/or maintenance of the Highland Manor Project, [the Defendant was to receive additional sums of $1,247.00 and $396.35, respectively.]

13. To date, [the Defendant] has made payments to [the Debtor] totalling $163,-612.88 under the Highland Manor subcontract.

14. [The Defendant] has incurred expenses in the total sum of $2,659.83 in completing certain obligations of [the Debtor] and is entitled to and has backcharged [the Debtor's] account by reason thereof.

15. As of December 10, 1984, [the Defendant] was current in its payments to [the Debtor] based upon work completed to that date. Additional payments were not due to [the Debtor] until:

(a) [the Debtor's] work was fully completed and performed in accordance with the Highland Manor subcontract;

(b) [The Debtor's] bills for its subcontractors and supplies had been paid;

(c) [The Debtor's] work was accepted by the Owner and Architect; and

(d) [The Defendant] received payment for [the Debtor's] work from the owner.

16. As of December 10, 1984, [the Debtor] owed its subcontractors and suppliers $60,-640.78 in connection with the Highland Manor subcontract work.

17. On or about March, 1985, [the Debtor] fully completed and performed its work in accordance with the Highland Manor subcontract.

18. On or about April 15, 1985, the Owner and Architect accepted [the Defendant's] work on the Highland Manor Project, including the work performed by [the Debtor].

19. On or about August 20, 1985, [the Defendant] received payment for all work performed on the Highland Manor Project by [the Debtor].

20. Between December 10, 1984 and August 20, 1985, [the Surety] ... paid all of [the Debtor's] outstanding bills for [the Debtor's] subcontractors and suppliers in the aggregate amount of $61,951.64.

21. As of August 27, 1985, [the Debtor] and/or [the Surety] were due final payment from [the Defendant] under the terms of the Highland Manor subcontract in the amount of $45,370.64[,] subject only to [the Defendant's] alleged right to set off its claim against [the Debtor] arising from the Applewood Apartment Project, which right to set off is [in dispute in this action].

B. CENTENNIAL VILLAGE PROJECT

22. On or about April 20, 1984, [the Defendant] entered into a contract with Ashwood Associates whereby [it] agreed to perform certain work relating to the construction of a project known as Centennial Village ... ("Centennial Village Project").

23. On or about June 8, 1984, [the Defendant] entered into a written subcontract with [the Debtor] ("Centennial Village subcontract") whereby, upon the terms and conditions stated therein, [the Debtor] agreed to perform certain work relating to the ... Centennial Village Project....

24. In connection with the Centennial Village subcontract, on or about June 15, 1984, [the Debtor], as principal, and [the Surety], made, executed and delivered to [the Defendant], as obligee:

(a) a Subcontract Performance Bond ... and

(b) a Subcontract Labor and Material Payment Bond....

25. Pursuant to the Centennial Village subcontract, [the Defendant] agreed, *inter alia*, to pay to [the Debtor] the sum of $68,400.00 upon [the Debtor's] completion of the work provided for in said subcontract.

26. Subsequent thereto, on or about November, 1984, [the Defendant] and [the Debtor] executed a change order reducing, *inter alia*, the amount to be paid [to the Debtor] under the subcontract to $33,-441.00.

27. To date, [the Defendant] has made payments under the Centennial Village subcontract totalling $11,696.40.

28. As of December 10, 1984, [the Defendant] was current in its payments to [the Debtor] based upon the work completed to that date. Additional payments were not due to [the Debtor] until:

(a) [The Debtor's] work was fully completed and performed in accordance with the Centennial village subcontract;

(b) [The Debtor's] bills for its subcontractors and suppliers were paid;

(c) [The Debtor's] work was accepted by the Owner and Architect; and

(d) [The Defendant] received payment for [the Debtor's] work from the Owner.

29. As of December 10, 1984, [the Debtor] owed its subcontractors and suppliers $2,766.07 in connection with the Centennial Village subcontract work.

30. On or about January 19, 1985, [the Debtor] fully completed and performed its work in accordance with the Centennial Village subcontract.

31. On or about September 20, 1985, the Owner and Architect accepted [the Defendant's] work on the Centennial Village Project, including the work performed by [the Debtor].

32. On or about January 17, 1986, [the Defendant] received payment for all work performed on the Centennial Village Project, including the work performed by [the Debtor].

33. Between December 10, 1984 and January 17, 1986, [the Surety] paid all of [the Debtor's] outstanding bills [to its] subcontractors and suppliers in the aggregate amount of $2,766.07.

34. As of January 24, 1986, [the Debtor] and/or [the Surety] were due final payment from [the Defendant] under the terms of the Centennial Village subcontract in the amount of $21,774.60[,] subject only to [the Defendant's] alleged right to set off its claim against [Debtor] arising from the Ap-

plewood Apartment Project, which right to set off is [in dispute in this action].

## C. APPLEWOOD APARTMENT PROJECT

35. On or about March 22, 1984, [the Debtor] submitted a telephone quotation to [the Defendant] for certain ... work it proposed to perform at a project known as Applewood Apartments.... The bid submitted by [the Debtor] for Plumbing Work totalled $92,020.00. [The Debtor's] bids were the lowest bids received by [the Defendant] for said work.

36. In reliance upon [the Debtor's] bid, [the Defendant] included the costs thereof in its bid to the Owner of the project, Health Village Retirement Community, and [the Defendant] was deemed the low bidder and awarded the contract by the Owner on or about July 5, 1984.

37. By letter dated July 18, 1984, [the Debtor] confirmed its price for the aforesaid [work] ... and ... the agreed upon price ... totalled $174,812.00....

38. In reliance upon the promises and assurances given by [the Debtor] and in furtherance of the written confirmation of July 18, 1984, [the Defendant] prepared a subcontract agreement between [the Defendant] and [the Debtor,] which was transmitted to [the latter] on or about July 31, 1984....

39. [The Debtor] refused to execute the subcontract agreement or to perform any work on the Applewood Apartments Project.

40. On or about September 11, 1984, [the Defendant] entered into a subcontract agreement with [another contractor] to perform the [work] on the Applewood Project for the price of $62,118.00....

41. On or about October 11, 1984, [the Defendant] entered into a subcontract agreement with [another contractor] to perform [other work] on the Applewood Apartments Project for the price of $135,000.00.

42. The total cost to [the Defendant] in subcontracting for the [work] exceeded the agreed subcontract [with the Debtor's] price by $22,306.00.

43. During the period from September 5, 1984 to October 10, 1984, [the Defendant] incurred additional costs ... due to the lack of [performance by the Debtor]....

## D. ADDITIONAL MATTERS

44. By order dated January 28, 1985, [this Court] authorized [the Debtor] to enter into a Stipulation and Trust Agreement with [the Surety] concerning the payment of all "contract balances" due [to the Debtor] under its contract and/or subcontracts bonded by [the Surety] including, ... the Highland Manor and Centennial Village subcontracts.... By letters dated February 5, 1985, [the Defendant] was notified of the Stipulation and Trust Agreement and directed to make further payments under the Highland Manor and Centennial Village subcontracts to [the Surety].

45. Pursuant to the Order, Stipulation and Trust Agreement, [the Surety], in consideration of certain cash advance made and to be made to [the Debtor], was granted certain priorities and liens in and to all of [the Debtor's] account receivables, contract rights and/or general intangibles on the bonded contracts including, but not limited to, [the Debtor's] account receivables, contract rights and/or general intangibles for the Highland Manor and Centennial Village subcontracts.

46. To date, [the Surety], pursuant to the Stipulation and Trust Agreement, has made cash advances in the approximate amount of $939,102.00 to [the Debtor] and [the Debtor] has expended [some of this amount] in connection with the completion of [the Debtor's] bonded contracts including the Highland Manor and Centennial Village subcontracts.

47. On or about July 31, 1985, [the Defendant] filed a Proof of Claim with [this Court] ... claiming the sum of $32,828.00 against the estate of [the Debtor].

The right of a creditor to assert a setoff in the face of a claim against it by a debtor

in a bankruptcy proceeding arises from 11 U.S.C. § 553(a), which provides as follows:

(a) Except as otherwise provided in this section and in section 362 and 363 of this title, this title does not affect any right of a creditor to offset *a mutual debt* owing by such creditor to the debtor that arose *before the commencement of the case* under this title against a claim of such creditor against the debtor that arose *before the commencement of the case....* (emphasis added)

■ The right of setoff expressed in § 553 "does not ... create any new right of setoff where none exists under non-bankruptcy law," 4 COLLIER ON BANK-RUPTCY, ¶ 553.02, at 553–9 (15th ed. 1986), and is restricted in its application by both legal and equitable principles. *Id.* at 553–9, and 553–11. That is to say, the bankruptcy courts will not recognize the right of setoff if its exercise is not within the strict confines permitting its invocation under applicable state law, *see id.* ¶ 553.06, at 553–31 to 553–34, nor will the bankruptcy courts permit its invocation where to do so would be inequitable.

Collier also notes that the enactment of the Code setoff provisions "represent a decision by Congress to restrict the right of setoff and to treat its exercise as a preference under certain limited circumstances." *Id.,* ¶ 553.01, at 553–6. Collier also points out that Congress, in enacting the Code, found that the "earlier setoff provision is now considered to have been too broad" and that the result of such a broad provision, which Congress meant to correct by narrowing its scope in the Code, was "that certain creditors received a preference to the detriment of other creditors and the debtor's estate." *Id.,* ¶ 553.02, at 553–9.

It is not surprising that the concept of setoff would be applied restrictively in bankruptcy proceedings. One of the basic tenets of bankruptcy is that all creditors of a debtor must be treated equally in the disposition of their respective claims. For this reason, trustees in bankruptcy have a wide range of powers to avoid certain pre-petition and post-petition transactions which would tend to give any creditor prioritized treatment, as set forth in 11 U.S.C. §§ 542 to 549. Providing to a certain creditor, simply because the debtor also fortuitously happens to have a claim against the creditor, with a right to receive any sort of favored treatment is a concept which runs directly counter to the "share equally" concept. Therefore, any exception to the "share equally" concept effected by a particular creditor's right of setoff should properly be narrowly construed. Our Court of Appeals has, consistently with these principles, restricted efforts by creditors, even governmental creditors, to utilize setoff. *See Lee v. Schweiker,* 739 F.2d 870, 875 nn. 5 & 7 (3d Cir.1984); *Cooper-Jarrett, Inc. v. Central Transport, Inc.,* 726 F.2d 93 (3d Cir.1984); and *United States on behalf of Internal Revenue Service v. Norton,* 717 F.2d 767 (3d Cir.1983). Thus, in *In re H. Wolfe Iron & Metal Co.,* 64 B.R. 754, 756 (Bankr.W.D.Pa.1986), the court holds that, since "setoff creates a permissible preference of one creditor over others, it must be strictly construed." Also, in *In re Cusanno,* 29 B.R. 810 (E.D. Pa.1983), *aff'g,* 17 B.R. 879 (Bankr.E.D.Pa. 1982) (Per KING, B.J.), this court properly severely limited the right of a bank to set off a deposit of a debtor-customer against a debt owed by the customer to the bank.

The pertinent Bankruptcy Code provision, 11 U.S.C. § 553(a), as is indicated in the emphasis supplied above, contains within it several express restrictions. One is that only a "mutual debt" may be setoff. Another is that both the debt owed to the debtor *and* the debt owed to the creditor by the debtor must arise "before the commencement of the case." If any of these preconditions cannot be met, then setoff cannot be applied. Thus, in *H. Wolfe, supra,* the court holds that "it is essential" that these two "key restrictions" be overcome if setoff is to be allowed under the Code. 64 B.R. at 756.

In the instant factual setting, there is no dispute that the debt owed to the Defendant by the Debtor, relating to the Applewood Apartment Project, arose before the

commencement of the case. However, there are disputes relating to the following: (1) Whether the Defendant's obligations on the Highland Manor Project and the Centennial Village Project arose before the commencement of the case; (2) Whether the claim of the Defendant from the Applewood Apartments Project is "mutual" to the claim of the Plaintiffs on the other two (2) projects, especially since the surety is now, in a sense, the party in interest in recovering on the claims arising from the work on the Highland Manor Project and the Centennial Village Project rather than the Debtor.

■ The Court holds that the Defendant's obligations on the Highland Manor Project and the Centennial Village Project cannot, in this context, be said to have arisen prior to the commencement of the case. Although, as set forth in the Stipulation of Facts, the sub-contracts between the Defendant and the Debtor for these projects were entered into on or about January 30, 1984, and June 8, 1984, respectively, prior to the December 10, 1984, filing date, the work on the respective Projects was not completed until March, 1985, and January 19, 1985, respectively, and not accepted by the owners until April 15, 1985, and September 20, 1985, respectively. Even without the guidance of any precedents, we would be hardpressed to state, under any circumstances, that the claim of the Debtor on either of these projects "arose" before the work was completed.

However, any doubt is resolved by comparison to the facts here to those in the leading case, *Cooper-Jarrett, supra*. In that case, the Debtor brought suit against a carrier for breach of a purchase contract prior to the Debtor's bankruptcy filing. The Debtor also incurred pre-petition obligations to the carrier, which the carrier did not raise as a counterclaim in the Debtor's pre-petition suit, but concerning which it

filed a proof of claim in the bankruptcy case. Subsequent to the bankruptcy filing, the Debtor's suit was settled. The carrier then attempted to set off its claim against the sum due from it pursuant to the terms of the settlement. The Court of Appeals affirmed the district court, holding that, even though the underlying "claim" which the Debtor had against the carrier was a pre-petition claim, the settlement agreement created a new, post-petition "claim" of the Debtor to which setoff, per 11 U.S.C. § 553(a), could not be applied.

In rebuttal, the Defendant here cites only to *In re Hart*, 50 B.R. 956 (Bankr.D.Nev.1985), and to the following quote from Collier: "The right of setoff may be asserted in a bankruptcy case even though at the time the petition is filed one of the debts involved is absolutely owing but not presently due." 4 COLLIER, *supra*, ¶ 553.10, at 553–47. *Hart* is of no help whatsoever to the Defendant, as the court there *refused* the attempt of the Plaintiff-husband to setoff his future child support payments against an obligation of the Wife-Debtor to pay him the sum of $15,000.00, per a property settlement. The quotation from Collier emphasizes that the debt must be *"absolutely* owing" prior to the bankruptcy filing. We do not see how the Defendant's obligation to the Debtor could have the requisite degree of being "absolute" before the Debtor had completed its work on the project.[1]

A case which, at first blush, might appear the most supportive of all of the reported cases, of the Defendant's position, which it fails to cite, is the decision of Chief Judge Goldhaber of this court after remand from the district court in *In re Zerodec Megacorp, Inc.*, 59 B.R. 272 (Bankr.E.D.Pa.1986). In that case, the Debtor sued a company which was, *inter alia*, its sales agent on a commission basis for breach of

---

1. The Defendant suggests that this passage indicates that Collier would interpret *Cooper-Jarrett* in such a fashion as to support its position. The error of this analysis is, however, manifested by noting that Collier discusses *Cooper-Jarrett* in its discussion of the prerequisite that both claims must be pre-petition to allow invocation of § 553(a), 4 COLLIER, *supra*, § 553.08, at 553–39, and not at all in its discussion regarding claims "in existence but unmatured or unliquidated when petition is filed," *i.e.*, ¶ 553.10.

contract. The agent-defendant sought to assert a claim of commissions due to it as a setoff. The Court held that the sales commissions which were attributable to pre-petition sales, but not payable until the purchasers paid for the goods, (which occurred post-petition), constituted pre-petition claims.

There are, however, two (2) distinctions between the facts of *Zerodec* and those of the instant case. First, the Debtor here had not yet performed all of *its* responsibilities as of the filing date; the agent in *Zerodec had* performed *its* responsibilities as of the filing, but was merely waiting for the purchasers to make payment. The two (2) cases would be comparable if, here, all that remained to be done as of the filing date was for the owners to accept the work completed. However, here, the Debtor's performance *and* the acceptance of the work occurred post-petition.

Secondly, and perhaps more significantly, the finding that the claim arose pre-petition in *Zerodec* resulted in a conclusion by Judge Goldhaber there that setoff could *not* be asserted, as the Debtor's claim against the sales agent there was indisputably post-petition. *See* 60 B.R. 884 (E.D. Pa.1986). When the principle that setoff is narrowly construed against the party asserting it, to which Judge Goldhaber adhered, is considered, it can be seen that the decision here and in *Zerodec* are perfectly consistent.[2]

There is, here, a potential independent basis for refusing to find a setoff, per 11 U.S.C. § 553(a), due to a possible absence of the element of mutuality. As the Surety vigorously argues on its own behalf, by paying the claims of the Debtor's subcontractors and suppliers, it became subrogated to the rights of both the Defendant and the subcontractors and suppliers in reference to the Highland Manor Project and the Centennial Village Project. *See, e.g., United States v. Commonwealth Department of Highways,* 349 F.Supp. 1370, 1380

(E.D.Pa.1972). We are, however, reluctant to rely on this argument as a basis for our decision because it proves too much. If the Surety really is the only interested party, the propriety of this proceeding, as part of the Debtor's case, in this bankruptcy court, might be queried. Since the Defendant has not questioned this point, however, we shall not pursue it further.

Finally, we point out that the automatic stay, in any event, bars the Defendant from setting off any claims against the Debtor without first obtaining relief from the stay. By its very terms, 11 U.S.C. § 362(a)(7) provides that "a petition ... operates as a stay, ... of ... the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; ..." If the Defendant here is correct in its argument that its obligation to the Debtor is a *pre-petition* debt, which is its only means of skirting the holding of *Cooper-Jarrett,* then it cannot avoid the stay under the terms of 11 U.S.C. § 362(a)(7).

We should add that we believe that the stay is in place even though the debts in issue have been found by us to be debts owing to the Debtor that arose *after* the commencement of the case. Without the justification that it is a setoff, the Defendant's actions are barefaced attempts to "recover a claim against the debtor that arose before the commencement of the case," 11 U.S.C. § 362(a)(6), or an act "to exercise control over the property of the estate." 11 U.S.C. § 362(a)(3).

It may be some comfort for the Defendant here to know that many defendants in adversarial proceedings in this Court brought by debtors to collect accounts receivable, or set aside preferential transfers, or institute other actions to enforce contractual rights, assert counterclaims against debtors freely and only rarely are met with motions to dismiss. In the instant case, as we mentioned initially, the

---

**2.** As Collier notes, there is considerable question, although a split of authority on the point, as to whether setoff can properly be applied when both obligations are post-petition. 4 COLLIER, *supra,* ¶ 553.08, at 553–40.

§ 362 issue was raised by us *sua sponte*. Because we raised the issue in this matter, we accorded the parties an opportunity to address the issue of whether the automatic stay applied when the counterclaim, in the nature of setoff or otherwise, was asserted in a proceeding in this Court as opposed to being asserted in some non-bankruptcy forum. Neither party could articulate any reason why the stay should *not* apply to actions in this forum, and neither can we. Given the directive in the *St. Croix* case cited *supra* that we must raise the automatic stay issue *sua sponte* when we observe its applicability, we caution litigants to anticipate our raising this issue in numerous adversarial proceedings before us in the future.[3]

As Collier points out, it is certainly possible for the party seeking to assert a setoff as a defense to seek relief from the automatic stay, per motion, to obtain permission to raise the setoff defense. *See* 4 COLLIER, *supra*, ¶ 553.05[2], at 533-29 to 553-31. However, until such relief is obtained, the substance of such pleadings are void. The only recourse for a defendant wishing to plead setoff is to assert that it has a defense of setoff, indicate in its answer that it is seeking relief from the stay, and then proceed to file a motion for such relief promptly, preferably making its filing in both the main case and the adversarial proceeding. We cannot, even if we were so inclined, "waive the automatic stay provision" of § 362, as the Defendant in this case, realizing the applicability of the stay, requests us to do.

We do note that "[a]n allowed claim ... that is subject to setoff under section 553 of this title, is a secured claim" to the extent of the setoff. 11 U.S.C. § 506(a). We also note that 11 U.S.C. § 542(b) provides that an exception to the requirement that funds in the possession of a non-custodian need be turned over to the trustee or debtor-in-possession exists in the case of a "debt ... under section 553 of this title against a claim against a debtor." However, we agree with the holding of Judge King in *In re Harris*, 19 B.R. 624, 626 (Bankr.E.D.Pa.1982), that § 542(b) "does not state that the court may not, under certain circumstances, order a turnover of a debt subject to setoff under § 553." Given our inclination against granting any dispensations to the general bankruptcy concept barring preferential treatment to any creditors unless expressly sanctioned by the Code, we would not be inclined to grant relief from automatic stays and permit parties asserting claims of setoff to obtain exemption from turning over amounts owed to debtors freely.

Here, however, we need not ponder over that issue. The Defendant here has no valid right of setoff against the Plaintiffs. It therefore has no basis to refrain from turning over to the Plaintiffs what is owed to them, and there would be no basis to grant the Defendant relief from the automatic stay to assert its defenses here even if it had requested such relief.

■ Finally, the Plaintiffs ask that we assess pre-judgment interest against the Defendant from the respective dates that payments have been due under the Highland Manor and Centennial Village subcontracts to the date judgment is entered herein at the legal rate of six (6%) percent per annum. We agree with the Plaintiffs that the rule set forth in the RESTATEMENT (SECOND) OF CONTRACTS, § 354(1) (1981), which is as follows, has been adopted by the Pennsylvania courts:

(1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deduc-

---

**3.** We are aware of only one case addressing this issue, *In re Bell & Beckwith*, 50 B.R. 422, 429 (Bankr.N.D.Ohio 1985), where the court states that the Debtor's "filing of an action against [a creditor] would have the effect of relieving to the stay as to [the creditor] for the limited purposes of asserting [related] counterclaims." We know of no logical reason why the Debtor's bringing suit should have this effect and, finding nothing in the Code or logic to support this statement, we decline to follow it.

tions to which the party in breach is entitled.

*See, e.g., Benefit Trust Life Insurance Company v. Union National Bank,* 776 F.2d 1174, 1178–79 (3d Cir.1985); *Penneys v. Pennsylvania Railroad,* 408 Pa. 276, 183 A.2d 544 (1962).

The Defendant's refusal to make the payments to the Plaintiffs is looked upon with disfavor by the Court for three (3) reasons. First, the actions of the Defendant, in asserting a claim of setoff and refusing to pay sums admittedly due but for this rather week setoff claim without first seeking relief from the automatic stay, were actions in themselves violative of the automatic stay, thus possibly subjecting the Defendant to the damages set forth in 11 U.S.C. § 362(h). Secondly, the actions of the Defendant were, from all appearances, a reflex action to refuse to pay obligations which it knew were due from it solely because the Debtor had filed bankruptcy, and it felt that, right or wrong, this was the most pragmatic course. Such actions cannot be tolerated by the Court, as such actions, if encouraged, would make it impossible for a debtor-in-possession to ever retain the cash flow necessary to reorganize and remain in business. Thirdly, the amounts admittedly owed to the Plaintiffs by the Defendant exceeded the sums which the Debtor owed to the Defendant by over $34,000.00, and the Defendant never tendered even the difference to the Plaintiffs, a position which we find impossible to justify under any reasoning.

Therefore, it appears to us that it would be totally just to grant the Plaintiffs' claim of interest. We therefore agree with the Plaintiffs that interest should be payable from August 27, 1985, to the date that payment is actually made, computed at six (6%) percent per annum on the agreed balance due of $45,370.64 on the Highland Manor Project; and payable from January 24, 1986, to the date that payment is actually made, computed at six (6%) percent per annum, on the agreed balance due of $21,774.60 on the Centennial Village Project. As per the enclosed Order, we shall request the parties to attempt to agree upon this sum when payment is made.