**In re WINDSOR COMMUNICATIONS GROUP, INC., t/a Norcross–Rust Craft Greeting Card Publishers, Debtor.**

**WINDSOR COMMUNICATIONS GROUP, INC., t/a Norcross–Rust Craft Greeting Card Publishers, Plaintiff,**

**v.**

**HAVERTOWN PRINTING COMPANY, Defendant.**

Misc. No. 86–296.

United States District Court, E.D. Pennsylvania.

Sept. 25, 1987.

Keith Leonard, Edward J. DiDonato, Philadelphia, Pa., for debtor/plaintiff.

Warren T. Pratt, Philadelphia, Pa., for defendant.

## ORDER

BECHTLE, District Judge.

AND NOW, this 25th day of September, 1987, upon consideration of the Report and Opinion of the United States Bankruptcy Judge of January 20, 1987, it is

ORDERED that judgment is hereby entered in favor of Windsor Communications Group, Inc., t/a Norcross–Rust Craft Greeting Card Publishers, and against Defendant, Havertown Printing Company, in the amount of $122,193.84, plus interest at prevailing market rates, as specified in the attached opinion dated January 20, 1987, and costs.

United States Bankruptcy Court for the Eastern District of Pennsylvania

Bankruptcy No. 82–03714K

Adversary No. 83–1971K

January 21, 1987

REPORT AND OPINION OF UNITED STATES BANKRUPTCY JUDGE

DAVID A. SCHOLL, Bankruptcy Judge.

The instant case comes before us in a very unusual procedural posture. An adversary proceeding was instituted on July 25, 1983, by the Debtor, Windsor Communications Group, Inc., t/a Norcross–Rust Craft Greeting Card Publishers (hereinafter referred to as the "Debtor"), for the turnover of certain paperstock in the possession of the Defendant, Havertown Printing Co. (hereinafter referred to as "Havertown"), or for a money judgment for the value thereof. The first count of the Complaint sets forth a cause of action for con-version while the second count seeks a declaration that the appropriation of the paperstock by Havertown was a preferential transfer which may be avoided under 11 U.S.C. § 547(b) of the Bankruptcy Code.

In its defense, Havertown has asserted that it was entitled to set off the value of paperstock in its possession against the debt owed to Havertown by the Debtor. A trial of this matter took place on September 22, 1983, before our predecessor, the Honorable William A. King, Jr. Having made a determination that this matter was non-core, Judge King, on June 5, 1986, submitted Proposed Findings of Fact, Conclusions of Law and an Order to the United States District Court for the Eastern District of Pennsylvania for consideration, review de novo, and entry of final judgment pursuant to 28 U.S.C. § 157(c)(1), where it was designated as Miscellaneous No. 86–0206 and assigned to the Honorable Louis C. Bechtle. On July 9, 1986, Judge Bechtle issued an Order which agreed in part and disagreed in part with the proposed Conclusions of Law, and which ordered that the case be "reversed and remanded to the bankruptcy court to determine the extent to which the defendant [Havertown] is entitled to an offset."

This matter is thus again before this Court. Because Judge King had previously determined the underlying cause of action, the conversion, to be a non-core or a related proceeding, and because the District Court has asked us to make a further determination, we will again submit Proposed Findings of Fact, Conclusions of Law and a proposed Order, consistent with the District Court's Order of July 9, 1986, to the District Court for entry of final judgment pursuant to 28 U.S.C. § 157(c)(1).[1]

■ We have adopted the Proposed Findings of Fact previously made by Judge

---

1. Had this matter come before us without the aforementioned procedural baggage, we would have been inclined to hold this to be a core proceeding and to render a final decision pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (O). *See In re Windsor Communications Group, Inc.,* 67 B.R. 692, 695–96, 697–98 (Bankr.E.D.Pa. 1986). Moreover, here, the Complaint is plead-ed as a preference action, which is expressly designated as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F). However, we have not disturbed the determination that this matter is non-core because we decline to address the Debtor's claim under 11 U.S.C. § 547(b). See page 217 n. 4 *infra.*

King, with a few modifications. However, we do not adopt any of the Discussion in Judge King's decision of June 5, 1986. Insofar as the District Court's Order has adopted and agreed with this Court's initial determination that Havertown had converted the Debtor's property, the only issue to be determined now is "the existence and extent of the offset." Order of Judge Bechtle, *supra*, at 3. We hold that Havertown is not entitled to set off its liability for willful conversion of the Debtor's property against monies owed to it by the Debtor because of our conclusion that a creditor may not obtain a larger share of the Debtor's estate than it would otherwise receive relative to other creditors by means of unlawful resort to conversion.

## PROPOSED FINDINGS OF FACTS

1.  The Debtor is a Delaware Corporation with its principal place of business and corporate headquarters located at 312 Exton Commons, Exton, Pennsylvania.

2.  An involuntary petition under Chapter 7 of the Bankruptcy Reform Act of 1978 ("Code") was filed against the Debtor on August 5, 1982, and the case was converted to a case under Chapter 11 on August 25, 1982, when an Order for Relief was entered.

3.  The Debtor was a debtor-in-possession until October 5, 1984, when its Plan of Reorganization was confirmed by Order of this Court.

4.  The Debtor instituted the instant adversary proceeding against Havertown on July 25, 1983.

5.  Havertown is owned by Alcom Printing Group. Both Roland Grietzer, Controller for Alcom, and William Coale, Executive Vice President of Alcom, were involved with Havertown and its dealings with the Debtor.

6.  The testimony presented at the trial showed that the Debtor purchased paperstock directly from paper manufacturers, which was used in the manufacture of greeting cards.

7.  The Debtor then arranged for the delivery of the paperstock to outside printers, such as Havertown, for manufacture into greeting cards.

8.  The Debtor utilized Havertown as a printer for a number of years, including the period from June, 1981, through June, 1982.

9.  During summer, 1981, and thereafter, the Debtor had suppliers send paperstock directly to Havertown as "inventory stock" to be used as needed by Havertown for the Debtor's printing jobs.

10.  The course of dealing between the Debtor and Havertown included the practice of having Havertown send an invoice for work done to the Debtor's Purchasing Department.

11.  Havertown dealt with Sheila Pierre and Terry Nazarewycz, employees of the Debtor in the Purchasing Department. Mr. Nazarewycz was Director of Purchasing for the Debtor.

12.  During the period from June, 1981, through January, 1982, discussions were held between the Debtor and Havertown regarding the Debtor's slow payments. In June, 1981, the Debtor and Havertown agreed to sixty (60) day terms.

13.  From June through December, 1981, the Debtor owed Havertown between $70,000.00 and $80,000.00 monthly. In January, 1982, the Debtor was behind in payments. For work already done and billed, the Debtor owed approximately $95,000.00 and had ordered an additional $55,000.00 worth of printing.

14.  In January, 1982, a payment of $29,000.00 was due from the Debtor but was not made. At that time, a decision was made by Mr. Grietzer and Mr. Coale of Alcom, and the President of Havertown (who was not identified by name at the trial), to offset the printing debts of the Debtor by using the Debtor's paperstock located on Havertown's premises for other printing jobs.

15.  Pursuant to directions from management, James J. Laurie, Production Manager of Havertown, informed both Ms. Pierre and Mr. Nazarewycz that Havertown intended to allocate the Debtor's paperstock to other customers and to

issue credit memos to the Debtor to off-set the Debtor's printing debts.

16. Three (3) credit memos were issued by Havertown as follows:

(1) January 25, 1982—$51,729.00

(2) February 4, 1982—$53,557.91

(3) February 8, 1982—$16,906.73

17. Each of the three (3) credit memos was mailed to the Debtor in the ordinary course of business at the following address, "Norcross/Rust Craft, 950 Airport Road, West Chester, Pennsylvania," but none of the credit memos were sent to the attention of any particular individual at Windsor.

18. In February, 1982, Robert Weist, Assistant Treasurer of Windsor, called Mr. Coale of Havertown to inquire about the purpose of the credit memos. Mr. Weist indicated that he did not have the authority to approve or reject Havertown's decision to offset the debt owed by using the paperstock and stated that he would get back to Mr. Coale.

19. On March 31, 1982, the Debtor received a confirmation of the physical inventory of Windsor paperstock on the premises of Havertown, signed by a Havertown employee, as part of its annually-conducted inventory for purposes of preparing its financial statements. (Exhibit P–1)

20. Although the March 31st inventory did not have a dollar value assigned to it, it showed that approximately $122,000—$124,000 worth of Windsor's paperstock was still in the possession of Havertown. Upon comparison of the credit memos issued in January and February of 1982 with the March 31st inventory, it is clear that the paperstock which Havertown stated that it intended to utilize still appeared on the March 31st inventory as property of Windsor.

21. In April, 1982, the Debtor, on its own initiative, executed three (3) notes payable to Havertown in the total amount of $130,439.12. The amounts of the three (3) notes were as follows:

(1) April 20, 1982—$46,863.54

(2) May 20, 1982—$42,967.58

(3) June 20, 1982—$40,608.00

22. The notes were forwarded to Havertown as evidence of the outstanding debt owed to Havertown by the Debtor which had been accrued in the form of open invoices for work done by Havertown. Mr. Coale of Havertown received the notes in April, 1982. He took the notes as "additional collateral," i.e., if they were paid on the maturity dates, he would purchase replacement stock for the stock used.

23. On May 13, 1982, Mr. Coale of Havertown sent a letter to Mr. Weist of Windsor by certified mail. The letter was received and signed for by a loading-dock employee of the Debtor.

24. The May 13, 1982 letter stated that, due to the Debtor's inability to make payments on the notes (which came due on April 20th, May 20th and June 20, 1982, respectively), Havertown was utilizing the Debtor's paperstock in its warehouse to offset a debt of $134,-886.92, plus interest.

25. On May 13, 1982, only the April note was past due.

26. Enclosed with the May 13, 1982, letter from Havertown were the three (3) credit memos described at paragraph 16, *supra*, dated January 25, 1982, February 3, 1982, and February 8, 1982, totalling $122,914.00 and reflecting the offset of Windsor's debt as a result of Havertown's decision to appropriate the paperstock.

27. The Debtor claimed that it had no record of receiving these credit memos prior to the May 13, 1982, letter.

28. Mr. Weist of Windsor did not see the May 13 letter until August, 1982.

29. On or about June 18, 1982, Mr. Weist spoke to Mr. Grietzer, Havertown's Controller, after learning about the May 13th letter. He requested a list of the Havertown invoices to which the three (3) credit memos had been applied. Mr. Grietzer mailed the information on June 18, 1982.

30. By letter dated August 6, 1982, Mr. Weist answered Mr. Coale's letter of May 13, 1982. (Exhibit P–3)

31. In pertinent part, the letter stated:

"... Had I received the letter in question [Coale's letter of May 13th to Weist] I could only have protested the action taken by Havertown. In the first place, you recite balances due you as $134,886.92 against the note amounts of $130,439.12 which were then outstanding. Naturally before any action could be taken, our balances would have had to be reconciled.

Secondly, and this is the reason for this letter, in a unilateral action for which Norcross–Rust Craft had given no written approval by a qualified officer, Havertown was placing itself in the advantageous position in relation to the other creditors of Norcross–Rust Craft. Even if I have been aware of your actions, I would not have had authority to place Havertown in a position of precedence over other creditors.

At this late date, I can only protest the action which you have taken and urge you to reverse your actions. Since the notes have not been returned to us you must still have them in your possession. This evidences our debt to you. And since you have used the paper in question, we should be reimbursed in cash for the paper you have used.

(Exhibit P–3).

32. On or before the end of Havertown's fiscal year, on April 30, 1982, Mr. Grietzer gave credit on Havertown's books to the Debtor for the three (3) credit memos totalling $122,193.84.

33. Prior to April 30, 1982, Mr. Grietzer prepared the year-end balance for Havertown and allocated the three (3) credit memos against specific invoices resulting in a balance due and owing from the Debtor to Havertown, as of April 30, 1982, of $23,900.00.

34. The April 30, 1982, year-end statement of Havertown carried a balance due from the Debtor of $23,900.00.

35. The setoff was completed on Havertown's books and records as of April 30, 1982.

36. The Debtor has listed Havertown in its bankruptcy schedules as an unsecured creditor for approximately $139,000.00, representing a debt of $134,886.92, as reflected in the May 13, 1982, letter, plus interest.

37. The Debtor's corporate books and records and schedules in bankruptcy show the notes to Havertown as open notes.

38. The Debtor's main lender and secondary lender had security interests in the paperstock which was located at the Havertown warehouse.

39. There was no direct evidence that Havertown has ever used the paperstock of the Debtor on other jobs, despite its declaration of intent to do so.

40. Despite somewhat contradictory testimony on Havertown's behalf, Havertown first displayed the intent to exercise dominion and control over the Debtor's paperstock in January, 1982.

41. By way of the Debtor's letter of August 6, 1982, the Debtor assumed that the conversion of paperstock had occurred by that date and demanded reimbursement for the unauthorized use of its property.

42. Because of the confusing and unclear testimony as to the exact dates on which the paperstock was actually converted to Havertown's use, we find that the conversion was completed on August 6, 1982, the date on which the Debtor protested the conversion and demanded reversal of the conversion or reimbursement for the paperstock.

## PROPOSED CONCLUSIONS OF LAW

1. Havertown unlawfully converted property of the Debtor valued at $122,193.84.

2. The act of conversion was completed at the time the Debtor demanded the return of, or alternatively, the reimbursement for its paperstock, on August 6, 1982.

3. The right to setoff is discretionary in the bankruptcy court.

4. Havertown was a bailee for the property of the Debtor.

5. Setoff is inapplicable to a situation where the Debtor's property is in possesion of a creditor as bailee or trustee without color of lien. Havertown's plea

for setoff is premised upon an unlawful act of conversion and cannot be allowed.

6. Havertown is therefore not entitled to set off its liability for willful conversion of the Debtor's property against monies owed to it by the Debtor.

7. The Debtor is entitled to judgment in its favor in the sum of $122,193.84, with interest at prevailing market rates from August 6, 1982, to the date of judgment, and costs.

## DISCUSSION

The proposed Conclusions of Law previously submitted by Judge King and with which Judge Bechtle of the District Court disagreed are as follows:

2. Havertown did not allege in its answer to the complaint, by way of counterclaim or affirmative defense, a valid right to set-off the debt owed to it by Windsor [the Debtor].

3. Windsor [the Debtor] is entitled to judgment in its favor and the entry of an Order directing Havertown to return the paperstock of Windsor [the Debtor] in its possession, or to pay Windsor [the Debtor] the value thereof in the sum of $122,193.84, with interest at prevailing market rates from the date of the commencement of this adversary proceeding, July 25, 1983, to the date of judgment, and costs.

As was stated by Judge Bechtle in his Order of July 9, 1986, it follows that, having determined that Havertown had not pleaded a setoff, Judge King did not consider the issue of whether and to what extent, if any, Havertown was entitled to a setoff. Having disagreed with Judge King's determination that Havertown had failed to plead a setoff, Judge Bechtle reasoned that, since the bankruptcy court found that Havertown had converted the

Debtor's property, "the bankruptcy court had to consider the matter of offset." Order of Judge Bechtle, *supra*, at 2. Judge Bechtle further stated that "the bankruptcy court should have determined the existence and extent of the offset." *Id.* at 3.

In his Order, Judge Bechtle briefly reviews the evidence and concludes that

[the] Defendant is not entitled to offset the entire sum ... [and that] the court cannot determine from this record the extent to which defendant is entitled to an offset.

Accordingly, IT IS ORDERED that this case is *reversed* and *remanded* to the bankruptcy court to determine the extent to which Defendant is entitled to an offset. *Id.*

In compliance with Judge Bechtle's Order, we have now determined the *extent* to which Havertown is entitled to a setoff. We hold, as a matter of law, Havertown is not entitled to *any* setoff because its claim of setoff is premised upon the unlawful act of conversion.[2]

Under the Bankruptcy Code, setoff is governed by 11 U.S.C. § 553, which provides in pertinent part as follows:

(a) Except as otherwise provided in this section and in section 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, ...

We begin our analysis by noting that the right of setoff expressed in § 553 is restricted in its application by both legal and equitable principles. *In re Lessig Construction, Inc.,* 67 B.R. 436, 441 (Bankr.E. D.Pa.1986). Furthermore, it is appropriate in the context of a bankruptcy to narrowly

---

**2.** We observe that it is possible that the intent of Judge Bechtle's Order was for this Court to make further findings of fact as pertaining to the amount, if any, of setoff to which Havertown was entitled. However, our interpretation of Judge Bechtle's Order leads us to initially determine the existence of Havertown's legal entitlement to setoff. Having determined that

Havertown has no valid right to setoff obviates the necessity of factual findings concerning the amount of setoff. We also should add that the record provides virtually *no enlightenment* on the issue of precisely when the paperstock was converted, and we are unwilling to open the record to permit further testimony relative to this issue.

construe setoff so as not to run counter to the fundamental principle of bankruptcy law that creditors of the same class should share equally in any distribution from the debtor. *Id.* at 441. Denial of setoff in the case *sub judice* is in harmony with this principle.

Cases construing § 553 and its predecessor, § 68(a) of the Bankruptcy Act (11 U.S.C. § 108),[3] demonstrate that it is well established that, when the creditor's claim for setoff is premised upon willful conversion of the Debtor's property, setoff must be denied. *Brunswick Corp. v. Clements,* 424 F.2d 673 (6th Cir.1970), *cert. denied,* 400 U.S. 1010, 91 S.Ct. 569, 27 L.Ed.2d 623 (1971); *Arkansas Fuel Oil Co. v. Leisk,* 133 F.2d 79 (5th Cir.1943); *In re Brendern Enterprises, Inc.,* 12 B.R. 458 (Bankr.E.D. Pa.1981); Annotation, *Right to Set Off Tort and Claim Contract Claim Against One Another Under Section 68(a) of the Bankruptcy Act,* 34 A.L.R.FED. 579, 589–95 (1977). This is because there is no *valid* right to setoff where conversion has occurred.

There are two (2) closely connected theories which serve as the basis of the aforementioned established rule that a creditor has no valid right to setoff when conversion has occurred. The first theory is that, since the right to setoff, in bankruptcy court, is discretionary, the court must exercise its discretion and, where justice and equity dictate, deny setoff. *Brunswick supra,* 424 F.2d at 675. "A creditor who converts the property of a bankrupt, if his conversion liability is simply setoff against his claim, would receive a larger share of the bankrupt's estate than if he were to share on a pro rata basis with the other creditors." *Id.* (citations omitted). We believe this reasoning to be sound, as it would be inequitable for a creditor to benefit via setoff from its unlawful act of conversion. To the extent that certain cases make reference to the existing preference period, *see Western Tie and Timber Co. v. Brown,*

196 U.S. 502, 25 S.Ct. 339, 49 L.Ed. 571 (1905); and *Arkansas Fuel Oil Co. v. Leisk, supra,* we again find ourselves in agreement with the *Brunswick* court that clearly "it is equity which dictates the rule and not that the conversion liability is treated as if it were a 'voidable preference.'" *Brunswick, supra,* at 676.

The second theory, that setoff pursuant to § 553(a) is inapplicable due to the lack of requisite mutuality, is discussed in *Brendern, supra,* which is on point with the facts of the case *sub judice.* In *Brendern,* the Debtor sought the turnover of equipment which had been shipped to the Defendant for warranty repairs as per their usual business arrangement. The Debtor was engaged in the business of selling audio equipment through various retail stores. The Defendant manufactured audio equipment to be sold through numerous retail outlets, such as that of the Debtor. In the course of their business agreement, the Defendant sold audio equipment to the Debtor for retail sale to consumers, and the Debtor agreed to accept the return of any defective equipment manufactured by the Defendant from the consumer. Additionally, the Debtor would provide the consumer with replacement equipment from the Debtor's stock, thereby satisfying the Defendant's liability for its warranties to the consumers.

Pursuant to this agreement, the Debtor would ship the returned defective equipment to the Defendant, after accumulation of a significant amount, for repair, credit, replacement, or cash refund. Prior to the filing of the bankruptcy petition, the Debtor shipped equipment to the Defendant for warranty repairs. The Defendant admitted that it had neither repaired, replaced, nor returned the equipment to the Debtor, but rather attempted to assert a right to retain the equipment as a setoff against the debt owed by the Debtor to the Defendant. The parties had stipulated that under a book

---

**3.** Section 553 is derived from and preserves, with some changes, the right of setoff in bankruptcy cases set forth in former § 68(a). H.R. Rep. No. 595, 95th Cong., 1st Sess. 377 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. The changes that § 553 introduced served to restrict the right of setoff, 4 COLLIER ON BANKRUPTCY ¶ 553.01, at 553–6 to 553–8 (15th ed. 1986), but are inapposite to the discussion herein.

account, the Debtor owed the Defendant the sum of $14,856.20.

Judge King of this Court held that setoff was inappropriate because of the lack of mutuality between the debts in issue was present. *Id.* at 460. "Mutuality requires that 'the debts and credits must be in same right, and between the same parties, standing in the same capacity.' 4 COLLIER ON BANKRUPTCY § 68.04 (2.1) at 867 (14th ed. 1978)." *Id.* at 459 (citations omitted). As was stated in *Brendern*, "a set-off is only applicable to cases where the debtor and the creditor 'owe' one another." *Id.* at 460 (citation omitted).

As was the case with the defendant in *Brendern*, Havertown had no debt to the Debtor to set off but for the unlawful conversion of property. Consequently, the requirement of mutuality is not met; and mutuality is generally held to be a prerequisite to setoff under the Code. *Id.; see also In re Vehm Engineering Corp.*, 521 F.2d 186, 190 (9th Cir.1975); *In re Plywood Co. of Pennsylvania*, 425 F.2d 151, 154 (3d Cir.1970); and *In re Potts*, 142 F.2d 883, 887 (6th Cir.1944), *cert. denied*, 324 U.S. 868, 65 S.Ct. 910, 89 L.Ed. 1423 (1945).

■ As was the case with the defendant in *Brendern*, Havertown was in possession of the Debtor's property as a bailee without color of lien, and the mere factor of possession of property cannot serve as the basis for the "debt" which Havertown seeks to setoff against its claim against the Debtor. *Id.* at 460 (citations omitted). Under Pennsylvania law, "[a] bailment is a delivery of personality for the accomplishment of some special object or purpose upon a contract, either express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it." *Brendern, supra*, 12 B.R. at 460 n. 6 (quoting *Smalich v. Westfall*, 440 Pa. 409, 413, 269 A.2d at 476, 480 (1970)). We are convinced that the facts support our conclusion that an implied contract of bailment existed in the case *sub judice*. Havertown was only holding the paper-

stock for use in the manufacture of greeting cards for the Debtor as directed by the Debtor.

Although the cases have thus couched the analysis of the availability of setoff based upon conversion in slightly different fashions, we are in total agreement with the concept that no valid right of setoff exists when based on conversion. The Debtor is therefore entitled to judgment in the full amount of the value of the paperstock sought by it, undiminished by any setoff.[4]

We believe that our determination that no valid right to setoff exists when based upon conversion is also supported by those cases which disallow setoff when it is premised on actions which are tortious, fraudulent, or similarly unlawful conduct by the party seeking setoff. *See Browner v. Rosen*, 56 B.R. 214 (D.Mass.1985); *In re O.P.M. Leasing Services, Inc.*, 35 B.R. 854 (Bankr.S.D.N.Y.1983). Such cases have held that where the party seeking the setoff is being sued for fraudulent transfers, setoff cannot be allowed because the requisite "mutuality of obligations" is missing. *Browner, supra*, 56 B.R. at 217; *O.P.M. Leasing, supra*, 35 B.R. at 868. Just as the *O.P.M. Leasing* court recognized that allowance of a setoff would "condone and legalize a fraudulent transfer," *id.*, we believe that allowance of a setoff in the case *sub judice* would condone and legalize the underlying conversion.

■ Having thus determined the existence and extent of Havertown's setoff as directed by the District Court, we turn briefly to the issue of whether the Debtor is entitled to prejudgment interest as sought by the Debtor and as was previously awarded by Judge King. The Debtor seeks pre-judgment interest in the nature of delay damages beginning with the date Havertown is deemed to have converted the paperstock, which we have determined to be August 6, 1982. Damages for conversion are calculated as of the time of conversion. *Campbell and Setzer v. Clark*

---

4. Having found that the Debtor is entitled to judgment in its favor on the First Count of the Complaint based upon conversion, we need not address the Debtor's claim under 11 U.S.C. § 547(b) in the Second Count.

*and Melia, Inc.,* 150 Pa.Super. 635, 641, 29 A.2d 350, 353 (1942). The Debtor has alternatively proposed the utilization of the prevailing 52–week Treasury Bill rate of 8.75% for May, 1983, or the legal rate of six (6%) percent for the calculation of interest. We agree with the Debtor that prejudgment interest is appropriate in this case because Havertown's conversion, having deprived the Debtor of the use of its property, entitles the Debtor to the market value of the converted property at the time of the conversion with interest until the date of recovery. *See Plack v. Baumer,* 121 F.2d 676, 679 (3d Cir.1941); *In re Lessig Construction Inc., supra.* Pennsylvania courts have recognized that, in instances involving conversion or destruction of property, time may be an important factor and a plaintiff may not be fully compensated unless an award includes the value of property calculated from the date of loss or conversion. *American Enka Co. v. Wicaco Mach. Corp.,* 686 F.2d 1050, 1056 (3d Cir.1982). This theory affords a plaintiff damages for delay for the "wrongful detention" of money, and provides the court with discretion to award interest in excess of the statutory rate of six (6%) percent,[5] and possibly at the market rate of interest. *Lexington Ins. Co. v. Abington Co.,* 621 F.Supp. 18, 20 (E.D.Pa.1985).

We believe that the use of the market rate to calculate the interest due here is proper, given the intentional nature of Havertown's conduct. The objectives of (1) affording full compensation to the Debtor and (2) providing a disincentive to defendants to delay and defend a clearly meritorious lawsuit, can be accomplished via application of the market rate of interest.[6] *See Lessig Construction, supra; Frupac International Corp. et al v. Lesco Distributing International Co.,* Civil Action No. 82–4875 (E.D.Pa., Opinion filed April 30, 1985) [Available on WESTLAW, 1985 WL 11180].

Reference to Judge Bechtle's analysis in *Frupac, supra,* is also helpful, as that case also involved computation of interest due to a victim of a conversion. Judge Bechtle reasoned, and we agree, that application of any rate lower than market value would allow the defendant, who had full use of the wrongfully retained property, to have potentially invested the value of the property at the market rate, but to only have to pay back a portion of the interest earned. Slip op. at 15. We will follow Judge Bechtle's lead and apply the annual rate of one-year treasury bills as the market rate. The rate shall also be compounded to reflect the true return to which the Debtor is entitled. *See also Lexington Ins., supra,* at 22. The calculations result in a delay damages award of $52,734.88,[7] in addition

**5.** See 41 P.S. § 202.

**6.** While not a factor in this decision, we also note that Havertown asserted a claim of setoff in this action without first seeking relief from the automatic stay, per 11 U.S.C. § 362(a)(7). We observe that, for this reason alone, this Court would be justified in denying Havertown any right of setoff, the assertion of such a claim being void without having first obtained relief from the automatic stay. *In re Lessig Construction, Inc., supra,* 67 B.R. at 443-44.

**7.** The annual rate of return of one year treasury bills was 11.099% for 1982, 8.86% for 1983, 9.91% for 1984, and 7.83% for 1985. *Federal Reserve Bulletin,* July, 1986, at A24. The rates of return for the relevant months of 1986 are:

(1) January, 1986—7.31%; February, 1986—7.19%; March 1986—6.61%; April, 1986—5.94%; May, 1986—6.17%; June, 1986—6.59%; July, 1986—5.98%. *Federal Reserve Bulletin,* October, 1986 at A24; (2) August, 1986—5.82%; September, 1986—5.33%. *Federal Reserve Bulletin,* December, 1986 at A24; (3) October, 1986—5.44%; November, 1986—5.45%. *Federal Reserve Statistical Release,* Release dated December 4, 1986; (4) December, 1986—5.60%. *Federal Reserve Bulletin,* January, 1987, at A24. The Court will use an average of the 1986 monthly rates (6.12%) for the annual rate fo return for 1986, since the annual rate is not available as of the date of this decision. The calculations are as follows:

to the principal amount of $122,193.84, measured through December 31, 1986.

| YEAR | RATE | MONTHLY/OR ANNUAL INTEREST | AMOUNT WRONGFULLY RETAINED ($122,193.84) WITH INTEREST |
|------|------|---------------------------|---------------------------------------------------------|
| 1982* | 11.099% | $ 5,573.16 | $127,767.00 |
| 1983 | 8.86% | 11,320.16 | 139,087.16 |
| 1984 | 9.91% | 13,783.54 | 152,870.70 |
| 1985 | 7.83% | 11,969.78 | 164,840.48 |
| 1986 | 6.12% | 10,088.24 | 174,928.72 |
| | Total | $52,734.88 | $174,928.72 |

* Interest calculated from August 6, 1982, to December 31, 1982.