**In re TM CARLTON HOUSE PARTNERS, LTD., Debtor.**

**TM CARLTON HOUSE PARTNERS, LTD. and Skokie Federal Savings and Loan Association, Plaintiffs,**

v.

**CAREER PLANNERS, INC. and Career Institute, Inc., Defendants.**

**Bankruptcy No. 88–10774S.**
**Adv. No. 88–0736S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 8, 1988.

As Amended Dec. 9, 1988.

---

Joanne Zack, Philadelphia, Pa., for Equity Sec. Holders.

Mark S. Lieberman, Chicago, Ill., Marvin Krasny, Philadelphia, Pa., for Skokie.

Cole Silver, Philadelphia, Pa., for Teebesco.

Geof Veit, Philadelphia, Pa., for Capital Group.

James J. O'Connell, Ass't. U.S. Trustee, Philadelphia, Pa.

Earl T. Stamm, Richard L. Kremnick, Philadelphia, Pa., for defendants.

Martin J. Weis, Virginia Miller, Lawrence G. McMichael, Philadelphia, Pa., for debtor.

Mark J. Packel, Philadelphia, Pa., for Creditors' Committee.

Stephen Raslavich, Philadelphia, Pa., for Bergs.

David Smith, Philadelphia, Pa., for Concap.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding presents a dispute arising when a commercial tenant contends that its landlord has failed to deliver its rented space in timely fashion and that, when delivered, the premises was smaller than set forth on the floor plan and contained certain defects, most notably a grossly-malfunctioning heating, ventilating, and air conditioning system (hereinafter referred to as "HVAC system"). Two factors added to the foregoing, make the instant factual picture sound like a law school examination question: (1) The parties' lease contained a set of unusual clauses which, effectively, allow the tenant to pay rent into escrow whenever there is a dispute until the dispute is resolved by Judicate, a private court system; and (2) In the midst of the disputes over the premises' condition which prompted the tenant to pay all of its rent into escrow, the landlord was thrown into an involuntary bankruptcy. Since the Debtor, TM CARLTON HOUSE PARTNERS, LTD. (hereinafter "the Debtor"), convinced us to deny an attempt to lift the automatic stay to allow a pre-petition Judicate proceeding to continue, filed by CAREER PLANNERS, INC. and CAREER INSTITUTE, INC. (hereinafter referred to collectively as "the Tenant"), resolution of this problem is our responsibility.

We hold that the funds placed in escrow are property of the Debtor's estate but that, as to the portion paid on account of rents due pre-petition, the Tenant is entitled to certain setoffs, including a $100,000.00 sum to be held in escrow towards repairs of the HVAC system, which exhaust all of the pre-petition deposits and exempt this portion of the escrowed funds from turnover. As to the portion paid on account of rents due post-petition, we hold that the Debtor is entitled to two-thirds of this sum, the balance being rebated because of the diminished space and continuing defects in the HVAC system. Upon repair of the HVAC system, we will cause the tenant's rebate to revert to a ten (10%) percent rebate. Regarding the amount in the account as of November, 1988, which we calculate should be $455,653.00, we order that $100,000.00 be retained to repair the HVAC system; $148,096.00 be paid to the Debtor; and the balance, which should be $217,557.00, be refunded to the Tenant.

### B. PROCEDURAL HISTORY

A history of most of the significant developments in the underlying involuntary Chapter 11 case were chronicled in a previous Opinion of August 18, 1988, in the main bankruptcy case, relating to disputes between the Debtor and one of its three mortgagees, SKOKIE FEDERAL SAVINGS & LOAN ASSOCIATION (hereinafter "Skokie"), centered on whether the Debtor's rents were cash collateral as to Skokie's mortgage. This Opinion, though reported at 89 B.R. 520, was withdrawn and replaced by an Amended Opinion of October 4, 1988, 91 B.R. 349, on Skokie's Motion for Reconsideration. The Amended Opinion makes only relatively minor changes to the earlier Opinion and reinstates the Order of August 18, 1988, accompanying the original Opinion. In both Opinions, we held that the rents are not Skokie's cash collateral.

Skokie was permitted to intervene in this proceeding as a party-plaintiff on August 3, 1988, the date that the trial began, but has not actively participated in it in any way, perhaps due to our decision that the rents are not its cash collateral. Without repeating the entire history of the case recited at 89 B.R. 521–23, we note that the involuntary petition was filed on March 7,

1988, and a consenting Order for Relief was entered on March 31, 1988.

The precursor of this proceeding was a motion of the Tenant filed on April 7, 1988, in the main bankruptcy case, seeking relief from the automatic stay to litigate its dispute with the Debtor in the Judicate forum. On May 5, 1988, we denied the motion.

Apparently, the Debtor was as dissatisfied with the status quo as the Tenant, since it was not receiving any rental payments from its largest tenant. Therefore, it commenced this proceeding on June 3, 1988. The Complaint recited three Counts: (1) A request that, since the escrow payments were property of the estate, they should all be turned over to the Debtor, pursuant to 11 U.S.C. § 542(a); (2) Two separate claims that the Tenant was violating the automatic stay in continuing to pay rents into escrow in that it was improperly (a) acting to recover a pre-petition claim; and (b) exercising setoff. On July 7, 1988, the Tenant answered, contending, *inter alia,* that the escrowed funds were its property and raising a series of Counterclaims directed towards its recovery of all of the sums paid into the escrow.

The matter came before us for trial on August 3, 1988. We had barely begun when an issue of a potential conflict of interest arose as to Skokie's participating counsel: it was discovered that a member of the same firm as participating counsel had representing the Tenant in negotiating the terms of the parties' Lease. The next day, this problem was resolved by withdrawal of Skokie's counsel from an active role in the trial. The trial was completed in the late evening of August 4, 1988.

The next day we entered an Order contemplating completion of submission of Proposed Findings of Fact, Proposed Conclusions of Law, and Briefs by each of the parties as of September 26, 1988. These submissions were delayed and finally received by us by October 7, 1988. However, the evidence presented left us uncertain as to the merits of the Tenants' allegations of defects in the HVAC system. Our belief that resolution of this dispute would be to the betterment of both parties resulting in our issuing an Order of October 11, 1988, urging the parties to mutually select an independent expert who could examine and report on same as the court's witness prior to a scheduled hearing on October 19, 1988. On the latter date, the parties could not agree on an expert, and, after independent investigation, the court appointed Lawrence G. Spielvogel, Inc. (hereinafter this entity and/or its principal of the same name as referred to as "Spielvogel"), an engineering firm recommended by the Debtor, as its expert in an Order of October 21, 1988. Pursuant to that Order, Spielvogel produced a written report on October 28, 1988, and was examined by the court and counsel on November 2, 1988. The report concluded that the HVAC was, in some respects, inadequate and, in other respects, being improperly maintained and operated by the Debtor. Spielvogel suggested that $100,000.00 be allocated towards correction of these defects.

We are obliged to present our decision in the form of findings of fact and conclusions of law by the terms of Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a). We limit our findings to those necessary to resolve the serious factual disputes and to those directly pertinent to our decision. We recite the conclusions of law as headnotes to topics of discussion of legal issues which follow.

## C. FINDINGS OF FACT

1. The Debtor owns and operates a large, multi-use commercial and residential apartment complex, built in 1962 and containing approximately 537 residential units and 42 commercial tenants, which covers an entire city block in a desirable area of downtown Philadelphia, Pennsylvania.

2. The Tenant consists of two separate inter-related corporations, one of which operates a temporary and permanent employment service, and the other of which operates an accredited business school. Both operations of the Tenant are housed together in a large space covering between 15,000 and 20,000 square feet on the first and second floors of the Debtor's building.

3. In January, 1986, the Tenant decided to relocate from a premises across the street from the Debtor's building because that building was going to be condemned for redevelopment and it needed more space for its operations.

4. During the negotiations, the Tenant advised the Debtor of its specific needs for space; its need to have the space available on specified dates which would coincide with the terms of its school; and its desire to have the placement office of the employment service visible to prospective students in the admissions office of the school. The Debtor indicated that it could and would supply designs consistent with these requirements.

5. Accordingly, the Tenant, after a period in which negotiations broke down and then resumed again, ultimately agreed to sign a lease, and it received a set of floor plans. Using the plan's legend, the Tenant's Chief Executive, Marilyn Ounjian, who had formerly lived in the Debtor's building, calculated the usable square foot-age of usable space recited in the Lease, and the Tenant purchased custom-made furniture in reliance on the accuracy of the plan.

6. On or about November 24, 1986, the Tenant entered in an Agreement of Lease (herein "the Lease") with the Debtor. The Lease was drafted by counsel for the Tenant, but was the subject of considerable negotiations between the Tenant's counsel and Debtor's counsel, who appeared to have approximately equal leverage.

7. The Lease provides for rental by the Tenant of 19,488 rentable square feet and 16,515 square feet of usable space in the first and second story of the Debtor's building. The Lease's term is ten years, commencing January 1, 1987, and ending December 31, 1996.

8. The Lease provides for monthly rental payments for the period January 1, 1987, through December 31, 1988, calculated with reference to price per square foot, as follows:

| Monthly Rental Installments | Annual Amount |
|---|---|
| 1987 | |
| First Floor: | |
| 1/1/87 through 2/28/87, Possession to be delivered 2/28/87, and no rent | |
| 3/1/87 through 8/5/87, Tenant to have possession and use of premises, rent abated through 8/31/87. | |
| 9/1/87 through 12/31/87 @ $6,001.00 per month. | |
| 1987 total rent for first floor/arcade level (September, October, November, December, 1987): | $ 24,004.00 |
| Second Floor: | |
| 1/1/87 through 9/30/87, Tenant to have use and possession but rent abated through 6/30/87. | |
| 7/1/87 through 9/30/87 @ $20,300.00 per month. | |
| 10/1/87 through 12/31/87 @ $21,767 per month. | |
| Totals: | |
| 1987 total rent for second floor | $126,201.00 |
| 1987 total rent for both floors: | $150,205.00 |
| 1988 | |
| 1/1/88 through 12/31/88 @ $27,768.00 per month for both floors | |

9. Paragraph five of the Lease provides that "tenant shall not have the right of set-off, but shall not be in default hereunder if it pays rent into a joint account pursuant to Paragraph 17 hereof." Paragraph 17 of the Lease provides, in part, as follows:

17. *Arbitration; Escrow.*

(a) Anything elsewhere contained herein to the contrary notwithstanding, in the event any dispute arises between Landlord and Tenant concerning any amounts alleged to be due hereunder by one party to the other, Tenant shall have

the right, pending resolution of the dispute, to make rental payments (in an amount up to the amount in dispute) into a joint account with a federally insured bank or savings and loan institution, rather than to Landlord directly. The terms of the account shall provide that Landlord (or its agent) and Tenant (or its agent) shall each be cosigners on the account and that funds held in the account may not be withdrawn without the consent of both parties.

(b)(i) Any claim or controversy between the parties arising hereunder may be submitted by either party to Judicate, or if Judicate is no longer available to arbitrate such disputes, to the American Arbitration Association, for resolution by arbitration pursuant to the applicable arbitration rule then obtaining. If there are any special arbitration rules for expedited proceedings, such rules shall be observed.

10. The Lease provides that the second-floor portion of its space is to be delivered to the Tenant by January 1, 1987, and the first-floor portion is to be delivered by February 28, 1987. The Lease further provides that possession will not be deemed to have been delivered until the space is "substantially completed" and the Debtor had obtained a Statement of Use and Occupancy from the Department of Licenses and Inspections of the City of Philadelphia (hereinafter "a Certificate") for that portion of the space. The Lease further provides that the Tenant is entitled to two days free rent for every day that the premises is delivered late.

11. However, during negotiations shortly after the Lease was executed, it was agreed that, in consideration for the Debtor's allowing the Tenant to temporarily occupy an alternative first-floor space, the Tenant allowed the Debtor an additional 30 days to complete the first-floor space.

12. The Debtor gave the Tenant keys to the second-floor space on December 26, 1986. However, several of the rooms were not completed and the City did not issue a Certificate for the second floor until January 20, 1987.

13. The alternative first-floor space was, according to the Tenant, unusable. On April 7, 1987, the Debtor gave the Tenant the keys to the originally-contemplated first-floor space and contended that it delivered possession. However, the Tenant immediately discovered that the Debtor had erroneously installed less attractive lighting fixtures in the ceilings than had been agreed, and the Tenant insisted that this be replaced immediately. Replacement was a difficult task, requiring alterations to high ceilings in the space, and the workmen disrupted the Tenant's use of the space. The re-installation of the lighting was not completed and a Certificate for the first floor was not issued until May 20, 1987.

14. Alan Cohen, a civil engineer, provided totally credible expert testimony on behalf of the Tenant that, due to errors in the floor plans, the total of the square footage of the leased space was actually only 17,539 square feet and the total usable space was actually only 13,477 square feet. As a consequence of these measurement differences, the rooms were smaller than the Tenant anticipated; it could not accommodate as many students as the Tenant anticipated; and some of the custom-made furniture which it had purchased could not be used and had to be placed in storage.

15. The Debtor did not install a planned window in the mezzanine area because it subsequently learned that the wall in which the window was to be placed was a sheer wall, in which a window could allegedly not be cut. The Tenant's intention that the placement office visible to prospective student applicants has, accordingly, been only partially realized.

16. The Tenant provided graphic and convincing evidence that the HVAC system in its space has never worked properly and that temperatures are randomly quite hot (over 80°) or quite cold (as low as below 50°) from one day to another and from one area to another, which causes discomfort to teachers and students in the school and other employees of the Tenant.

17. The parties were apparently unable to agree to hire an independent expert to evaluate the alleged deficiencies in the

HVAC system, requiring the court to appoint Spielvogel as its own witness who would inspect, evaluate, and estimate the costs of any repairs necessary to the HVAC system. The court totally accepts an adopts Spielvogel's report, which ascertains that the HVAC system is in some respects inadequate and in other respects improperly maintained and operated, which, in his opinion, will require the following expenditures which are the Landlord's responsibility to be cured:

| PROBLEMS | SOLUTIONS | ESTIMATED COST |
|---|---|---|
| First Floor and Mezzanine | Two New HVAC Systems | $ 10,000.00 |
| Cold Floor at Arcade | Baseboard Heat | 8,000.00 |
| Inadequate Ventilation | Service and Adjustments | 4,000.00 |
| Interior Temperatures | Service and Adjustments | 8,000.00 |
| Exterior Temperatures | Repair 5 VAV Boxes | 20,000.00 |
| General | Balance and Documentation | 30,000.00 |
| Subtotal | | $ 80,000.00 |
| Contingency | | 20,000.00 |
| Total | | $100,000.00 |

18. In addition to claiming damages for late delivery of its space totalling 100 days and measured at $176,926.00, the Tenant also claimed the following defects and consequential costs: (1) A failure of the Debtor to provide a specified number of electrical outlets, which it claimed would cost approximately $10,000 to install; (2) A failure of the Debtor to compensate the Tenant for agreed expenses for floor and wall covering of $13,796.76; and (3) Additional out-of-pocket expenses in the amount of $4,106.00 for completion of the renovation of bathrooms.

19. Despite these difficulties, the Tenant agreed that it has beautiful offices, which are more attractive than their prior premises. Despite that Mr. Ounjian appeared to be an individual likely to be sensitive and critical of such deficiencies if they existed, there were no aesthetic complaints about the space.

20. Although claiming substantial additional consequential damages as a result of the Debtor's alleged breaches of the Lease, *e.g.*, declining enrollment and consequent lost profits, the Tenant admitted that it has made no serious efforts to relocate from the premises.

21. Pursuant to our calculations of amounts due pursuant to the Lease, *see* Finding of Fact 8, page 863 *supra*, the Tenant, assuming that it made all of its rental payments into escrow pursuant to the portions of the Lease quoted at Finding of Fact 9, pages 863–64, *supra*, should have paid the following sums into escrow, through November, 1988:

| | |
|---|---|
| 1987 total rent | $150,205.00 |
| Rent at $27,678.00 January, 1988, through November, 1988 | 305,448.00 |
| TOTAL | $455,653.00 |

These payments can be further broken into pre-petition and post-petition rentals as follows:

A. Pre-petition

| | |
|---|---|
| 1987 total rent | $150,205.00 |
| January, 1988 through March, 1988 | 83,304.00 |
| TOTAL | $233,509.00 |

B. Post-petition

| | |
|---|---|
| April, 1988 through November, 1988 | $222,144.00 |

D. CONCLUSIONS OF LAW/DISCUSSION

1. The Interest of the Debtor in the Sums Held in Escrow is Property of the Debtor's Estate.

■ Contrary to the position of the Tenant and following our decisions in *In re Temp–Way Corp.*, 80 B.R. 699, 702 (Bankr. E.D.Pa.1987); *In re Ford*, 78 B.R. 729, 734–35 (Bankr.E.D.Pa.1987); and *In re Mason*, 69 B.R. 876, 882–83 (Bankr.E.D.Pa. 1987), we believe that the interest which the Debtor has in the rental payments deposited by the Tenant into escrow is within the broad scope of "property of the estate" of the Debtor, as defined in 11 U.S.C. § 541(a)(1). *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983). However, as our decisions in *Temp–Way* and *Ford* indicate, it does not necessarily follow from that determination, as the Debtor suggests, that it is entitled to immediate payment of the escrow funds.

■ The ultimate determination of the parties' rights turns upon our interpretation of paragraphs five and 17 of the Lease, *see* Finding of Fact 9, pages 863–64 *supra*. The Debtor argues, we believe myopically, that paragraph five effects a waiver of setoff, which is enforceable against the Tenant's rights to the funds under the holding of *In re Mauch Chunk Brewing Co.*, 131 F.2d 48, 49 (3d Cir.1942). More persuasive is the contention of the Tenant that, read in conjunction with paragraph 17, paragraph five merely requires the Tenant to pay all rents into escrow in the event of a dispute regarding liability, as opposed to allowing the Tenant to unilaterally deduct any claims from the rent.

The disputes resulting from the payment into escrow are then to be resolved in the presumably efficient Judicate forum. However, paragraph five cannot logically be read as a forfeiture on the part of the Tenant of all claims to setoffs against payments made into escrow. Rather, paragraph 17 clearly allows the Tenant to assert whatever rights of setoff against the escrow payments that Judicate would determine are justified. *Cf.* 15 U.S.C.

§§ 1640(h), (e) (consumer may not unilaterally set off a claimed liability of a creditor for statutory damages under the federal Truth-in-Lending Act, but may assert a defense of recoupment or setoff in a court collection action).

In addition to causing us to reject the Debtor's contention that the Tenant has, pursuant to certain Lease provisions, waived any right to setoff from the escrow funds, this analysis is helpful in characterizing the unique nature of the escrow funds. They are not, like the funds deposited into escrow by the state agency in *Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority*, 72 B.R. 619 (E.D.Pa.), *aff'd*, 800 F.2d 1132 (3d Cir.1986); and *Temp–Way*, *supra*, 80 B.R. at 702–05, funds to which the Debtor has no contractual rights whatsoever. On the other hand, the Debtor, unlike the factual scenario in *Mason*, *supra*, 69 B.R. at 883–84, is not the depositor of the funds, and therefore cannot make the argument articulated in the cases involving depositor-debtors cited in *id.* at 883; and *Paul v. Kennedy*, 376 Pa. 312, 102 A.2d 158 (1954), that it has legal title to the escrowed funds.

Rather, we interpret these clauses together as stating that, once the rentals are deposited into escrow, neither party has any title or right to same unless and until Judicate (or, if unavailable, the American Arbitration Association) decides the merits of the controversy between the parties. We denied the Tenant's motion for relief from the automatic stay to proceed under the aegis of Judicate under the doctrine that bankruptcy courts should not defer to other forums to resolve disputes relevant to property of the estate except in extraordinary situations. *Zimmerman v. Continental Airlines, Inc.*, 712 F.2d 55, 56–60 (3d Cir.1983); and *In re T.D.M.A., Inc.*, 66 B.R. 992, 995–97 (Bankr.E.D.Pa.1986). That decision causes this court to be put into the place of Judicate in paragraph 17 of the Lease.

Therefore, although we have no difficulty in finding that the Debtor's interests in the escrow fund are property of its estate, we believe that those interests can only be determined by this court's resolution of the controversy between the parties, as the Lease envisioned Judicate would accomplish.

2. The Tenant is Entitled to Set Off Pre–Petition Claims Against Pre–Petition Rentals Paid into the Escrow Fund, but is not Entitled to Set Off Pre–Petition Claims Against Post–Petition Rentals Paid into the Fund.

█ The Tenant's potential rights to set off against the escrow funds, in light of their classification as property of the estate, are circumscribed by 11 U.S.C. § 553(a), which provides as follows:

§ 553. Setoff

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case.

We have consistently emphasized the narrow scope of rights of setoff, because allowing a broad exercise of such rights runs counter to the fundamental principle of bankruptcy law that distribution among creditors must be equal and exceptions thereto must be interpreted restrictively. *See In re Windsor Communications Group, Inc.*, 79 B.R. 210, 215–16 (E.D.Pa. 1987); *In re St. Mary Hospital*, 89 B.R. 503, 507 (Bankr.E.D.Pa.1988); and *In re Lessig Construction, Inc.*, 67 B.R. 436, 440–42 (Bankr.E.D.Pa.1986). As we emphasize in *Lessig*, one of the "express restrictions" on the invocation of § 553(a) is

that *both* the debt owed to the debtor by the creditor seeking to invoke setoff *and* the debt owed to the creditor by the debtor which is attempted to be set off must arise pre-petition. *Id.* at 441–43.

We believe that, due to the unique nature of the escrow account in issue, setoff of pre-petition obligations of the Debtor to the Tenant therefrom is permissible. The Lease, obviously, negotiated at arm's length between two equally large and powerful entities, expressly provides, as we have interpreted it at pages 866–67 *supra*, that the disposition of rental payments paid into escrow pursuant to paragraph 17 is placed into the hands of Judicate, to be distributed between the parties in accordance with Pennsylvania landlord and tenant law. Since the bargaining was on such equal terms, we will give the Lease full force and effect as written. *Compare In re Andrews*, 78 B.R. 78, 81 (Bankr.E.D.Pa. 1987); and *In re Tashjian*, 72 B.R. 968, 976 (Bankr.E.D.Pa.1987) (adhesion contracts construed strictly against drafting party).[1]

We will therefore allow the Tenant to set off its pre-petition claims from the Debtor against the Debtor's pre-petition claims for rent against it out of the proceeds of the escrow fund. However, we will not allow the Tenant to set off any of its pre-petition claims against the Debtor's post-petition claims for rent out of the proceeds of the escrow fund.

3. The Claims of the Tenant for Late Delivery of the Premises and for All Other Damages, Including Expenditures to Repair the Premises to Bring it into Compliance with Proper Standards, and the Set–Aside to Repair the HVAC System of the Premises, are Pre–Petition Claims.

█ In *In re Frenville Co.*, 744 F.2d 332, 336–37 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925

---

1. We believe that a somewhat different analysis of the setoff effected upon a debtor's bank account by the invocation of a banker's lien or a bank's "administrative freeze" of an account is

in order because the "contracts" underlying such claims of setoff by banks are generally adhesion contracts. *See In re New York City Shoes, Inc.*, 78 B.R. 426 (Bankr.E.D.Pa.1987).

(1985), the Third Circuit Court of Appeals, while agreeing that the term "claim" was exceedingly broad, posited a notoriously-belated notion of when a claim arises, *i.e.*, not until a right of the creditor to payment of the claim arises. This holding has, to put it mildly, been questioned, as in *Grady v. A.H. Robins Co.*, 839 F.2d 198, 201 (4th Cir.1988), where the Fourth Circuit Court of Appeals states that "[w]e have found no court outside the Third Circuit which has followed the reasoning and holding of *Frenville*," and proceeds to cite numerous authorities expressly rejecting it. *Grady*, concluding that a claim of Dalkon Shield user which did not arise until after the bankruptcy filing was a pre-petition claim, holds that "all legal obligations of the debtor, no matter how remote or contingent" which existed at the time of filing are pre-petition claims. *Id.* at 202.

The Third Circuit Court of Appeals recently cites to its holding in *Frenville* in *In re Remington Rand Corp.*, 836 F.2d 825, 826 (3d Cir.1988). In that case, the issue decided which is relevant to the matter at bar was the determination of when a claim of the Government against the debtor under the federal Contract Dispute Act arose. In rejecting the Government's contention that its claim did not arise until a post-award audit was completed, the Court held that the claim arose when the Government knew it possessed a right for breach of contract against the Debtor. *Id.* at 832–33.

The largest category of the Tenant's claims arose from its contentions that the two floors of the premises were each delivered to it late, and that therefore the Lease provision entitling it to two days free rent for each day that delivery was late came into play. See Finding of Fact 10, at page 864 *supra*. Clearly, this particular claim is a pre-petition claim under any definition, because the claim arose, the Tenant knew it arose, and in fact the entire claim finished accruing, as soon as the Tenant admittedly accepted delivery, which occurred pre-petition.

The other large category of claims arose from defects to the leasehold. The most substantial of these is the now-documented deficiencies in the HVAC system. Others included the claims for compensation for installation of electrical outlets, carpeting and wall-covering purchases, costs for renovations to the bathrooms, and a wide range of consequential damages flowing from these alleged lease defaults. See Findings of Fact 14, 18, 20, at pages 864, 865 *supra*. While the issue is more clouded than consideration of the late-delivery claims, it seems apparent to us that the Tenant knew it possessed whatever right it has to these claims shortly after it moved in, and in any event knew of them well before an order for relief was entered in the Debtor's bankruptcy case on March 31, 1988. Thus, even under the narrow definition of pre-petition claims submitted by the Third Circuit Court of Appeals in *Frenville*, which has been soundly criticized as too narrow and appears to have been broadened to at least some degree by the decision in *Remington Rand*, all of the claims of the Tenant for damages due to the Debtor's failure to perform in accordance with the Lease are properly characterized as pre-petition claims.

Therefore, we conclude that all of the claims discussed under this heading are pre-petition claims, which can be set off by the Tenant against only the Debtor's claims for pre-petition rent, and not against the Debtor's claims for post-petition rent.

4.  The Claims of the Tenant for Rent Reductions Due to Continuing Defective Conditions in the Premises Are Entitled to be Recovered as Rebates on the Rent for Each Month in Which the Conditions Exist.

■ In contrast to our foregoing analysis of the treatment of the Tenant's claims based on the Debtor's failure to repair specific defects to the Tenant's space, we believe that the Debtor's continuing deficiencies in providing a reasonably fit space justify a rebate from the rent in each and every month that the defective conditions have been present.

If realty is residential in nature, the failure of a landlord to provide a premises which is reasonable for inhabitance is

termed a breach of the implied warranty of habitability of the premises. Since the landmark decision of the Pennsylvania Supreme Court in *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897 (1979), an implied warranty of habitability of residential realty has been expressly recognized in Pennsylvania. Recognition of the implied warranty of habitability results in the analysis that the landlord's obligation to provide a habitable premises and the tenant's duty to pay rent are mutually dependent, and that a breach of the implied warranty of habitability entitles the tenant to a rent abatement, either in whole or in part, depending on the severity of the breach of the warranty as to the particular premises in issue. *See In re Clark, Williams v. Clark,* 91 B.R. 324, 341 (Bankr.E.D.Pa.1988); *In re Fox,* 83 B.R. 290, 299–300 (Bankr.E.D.Pa. 1988); and *Pugh, supra,* 486 Pa. at 292, 405 A.2d at 907.

The fact that the landlord is a debtor, as opposed to the more common role of the debtor as tenant, does not alter the right of a residential tenant to abate rent. In *Clark,* we abated the entire rent due to the Debtor-landlord because we found that, by providing premises to his tenants which lacked any heat and, for the most part, any hot water through the winter, the debtor-landlord had totally breached the warranty of habitability. At 340–42. The fact that the debtor was the landlord did, however, as it does here, prompt us to take measures to compel that the debtor-landlord repair the conditions which were effectively wasting estate assets of potentially better income-producing property. *Id.* at 339–41, 342. Similarly, here, we shall direct the Debtor to repair the defective HVAC system in the building in order to prevent the effective waste of the premises by causing us to rebate over $6,000.00 monthly solely on the basis of this defect. See page 874 *infra.* The repairs, if in fact costing $100,000, would pay for themselves in lost rent in less than 17 months.

■ The Debtor argues that, while the existence of an implied warranty of habitability is now well-established as to residential realty, there is no application of this principle to commercial realty, as is in issue here. In a technical sense, the Debtor is correct. Habitability *per se* is not an issue when commercial space is in issue, because an office is not "inhabited," as is a home. However, we have little doubt that a comparable right of a commercial tenant to entitlement to a rent rebate exists under Pennsylvania law when a premises contains substantial defects. In *Teodori v. Werner,* 490 Pa. 58, 64, 415 A.2d 31, 34 (1980), the Supreme Court reasoned, as it did in adopting the warranty of habitability in *Pugh,* 486 Pa. at 279–84, 405 A.2d at 900–03, that landlord-tenant relations, in contemporary times, must rest on principles of the law of contracts rather than outmoded motions arising from medieval property law. *See also McDanel v. Mack Realty Co.,* 315 Pa. 174, 178, 172 A. 97, 98 (1934). Thus, in *Pawco, Inc. v. Bergman Knitting Mills,* 283 Pa.Super. 443, 451–55, 424 A.2d 891, 895–97, (1980), Judge Spaeth, writing for six of the seven members of the Superior Court, declines to find the existence of an implied warranty of habitability in a commercial-lease setting, but declines to follow the "independence-of-obligations approach" and concludes that a commercial tenant is entitled to rent rebates when a landlord fails to perform his obligations to the tenant under the parties' lease.

We therefore have no hesitancy in concluding that a commercial tenant, like the Tenant here, is, under Pennsylvania law, entitled to a rebate in the rents due to the Debtor in each month that the Debtor has failed to supply its space in conformity with its reasonable expectations under the Lease. This is especially so when the parties' Lease, like the Lease here, requires on its face that the landlord furnish the services which are deficient.

This right to rebates is distinct from the claims which the Tenant has arising from past defects. Instead of representing a separate claim which it attempts to offset against present or future rents, such rights undercut the Debtor's very right to collect the rents in the first place.

Hence, irrespective of whether the rent falls due pre-petition or post-petition, the Tenant's right to rebate a particular month's rent rises or falls according to the conformity of the premises with the Ten-

ant's reasonable expectations under the Lease in any given month. Therefore, the Tenant is entitled to a rebate in every month, pre-petition or post-petition, in which it establishes that its space was not in conformity with its reasonable expectations under the Lease.

5. The Tenant's Payment of Rentals into Escrow is not Violative of the Automatic Stay.

■ The goal of the Debtor's Complaint was to convince this court that, irrespective of the outcome of the disputes between the parties, the Tenant was obliged to pay all of the rentals directly to it, as opposed to into escrow. In the second and third Counts of its Complaint, respectively, the Debtor contends that, by not paying the rentals to it post-petition, the Tenant is violating 11 U.S.C. §§ 362(a)(6) and (a)(7), which provide as follows:

§ 362. Automatic stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, ... operates as a stay, applicable to all entities, of—

　.　　.　　.　　.　　.

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; ...

We disagree with the Debtor's contentions on this score. A setoff of pre-petition debts owed by a creditor to a debtor in bankruptcy against pre-petition claims of the debtor is a setoff within the terms of 11 U.S.C. § 553(a). See pages 867–68 *supra*. Although relief from the automatic stay may be necessary for the Tenant to invoke setoff, in light of § 362(a)(7), the request for relief in the nature of a setoff in bankruptcy-court litigation is logically the equivalent of a request for relief from the automatic stay. Our holding in *Lessig Construction* that relief from the automatic stay is needed before proceeding to invoke setoff, 67 B.R. at 443–44, is merely an

expressing of bankruptcy-court control over the process. Here, given the equities of the Tenant's position, we are inclined to allow the Tenant to invoke setoff. *Compare New York City Shoes, supra,* 78 B.R. at 428–31 (willingness to grant right to setoff tempered by adhesion-contract setting and potential of setoff to frustrate reorganization efforts); and *Lessig Construction,* 67 B.R. at 444 (Defendant had no right to setoff).

■ Our analysis of the nature of the Debtor's post-petition rental claims as conditioned upon its providing space to the Tenant which does not contain substantial defects, see pages 868–70, *supra,* is fatal to the Debtor's claim that the Tenant's act of paying rents into escrow is violative of 11 U.S.C. § 362(a)(6). It is not a violation of the automatic stay for a tenant to decline to make rental payments to a debtor which are not in fact due to it. *Compare Clark, supra,* at 340–42. In fact, speaking in more generic terms, we do not believe that it is a violation of the automatic stay for a party indebted to a debtor to refuse to make payments. The debtor's recourse, when it is not paid, is to file an adversary proceeding against the obligor in the bankruptcy court in the nature of an action to collect an account receivable, not to argue that its debtor is acting in violation of the automatic stay.

Furthermore, the unique nature of the operation of paragraphs five and 17 of the Lease, as discussed at pages 866–67 *supra,* renders any claim that the Tenant has violated the automatic stay by its actions even more tenuous. The parties expressly agreed that the Tenant was entitled to pay rents into escrow if a claim or controversy arose concerning rents due, subject to resolution by Judicate. The Tenant's payments into escrow simply constitute conformity with the Lease terms, subject to our within resolution in the stead of Judicate.

Therefore, the Debtor's attempt at recovery of all of the escrow funds, prior to our determination of the outcome of the dispute between the parties, on the basis of a claim that our refusal to do so would constitute a violation of 11 U.S.C. §§ 362(a)(6) or (a)(7), must be rejected.

6. The Debtor is not Entitled to an Immediate Turnover of the (1) Pre–Petition Escrow Payments, Because They are Subject to a Setoff Pursuant to 11 U.S.C. § 553(a); or (2) Post–Petition Escrow Payments, Because its Interest in Those Payments does not Entitle it to Same and it Has Offered no Adequate Protection to the Tenant.

■ In the first Count of its Complaint, the Debtor seeks to convince us to turn over all of the escrow funds to it immediately pursuant to 11 U.S.C. § 542(a), which provides as follows:

§ 542. Turnover of property to the estate

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

With respect to the pre-petition rental payments, we have already held that they are subject to setoff, pursuant to § 553(a), as to all pre-petition claims of the Tenant. *See* pages 867–68 *supra.* As a result of this conclusion, the rights of the Debtor to turnover of all pre-petition payments are limited by the terms of 11 U.S.C. § 542(b), which provides as follows:

(b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, *except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor* (emphasis added).

While we have previously held, in *New York City Shoes, supra,* 78 B.R. at 430–31; and *Lessig Construction, supra,* 67 B.R. at 444, that the right of a party asserting a setoff under § 553(a) to retain the property which is the subject of a setoff, under § 542(b), is not absolute, we have never questioned the fact that the normative disposition of the property is to allow the creditor asserting a setoff to retain it. Here, again, we fail to find the same sort of adhesion-contract setting and potential for frustration of the Debtor's reorganizational efforts which we found to be characteristic of bank setoffs in *New York City Shoes, supra.* Moreover, unlike the position of the bank in that case, we are not allowing the Tenant itself to hold the property to which offset is claimed, but are merely requiring that it continue to be held in escrow. Finally, we proceed to conclude that the Tenant here is entitled to set off the entire sum which it paid into the escrow on account of pre-petition rents. See pages 873–74 *infra.* Therefore, we are not inclined to obviate the normative disposition of the right of the claimant to avoid a turnover of property to the Debtor which is subject to a right of set off within the scope of § 553(a).

Furthermore, we again emphasize what we believe is the unique nature of the status of the escrow fund in issue here as a payment towards the amount of rent which we determine is actually due to the Debtor in the course of this Opinion. We do not believe that the interest of the Debtor in the funds, albeit that this interest is property of its estate, mandates that the post-petition rentals paid into the escrow fund be turned over to the Debtor before we determine its right to same.

Further, we note that the limitation on the right of a debtor to immediate receipt of any property of the estate which we highlighted in *Ford, supra,* 78 B.R. 735–37. There, we emphasized that the right of the debtor to turnover is subject to its satisfaction of all of the conditions of 11 U.S.C. § 363, including § 363(e), which requires that the debtor adequately protect the interests of a party whose rights would be adversely affected by a turnover of property pursuant to § 542(a). *See also, Whiting Pools, supra,* 462 U.S. at 201 & n. 7, 211–12, 103 S.Ct. at 2312 & n. 7, 2316–17; and *In re Koresko, Koresko v. Chase Manhattan Financial Services, Inc.,* 91 B.R. 689,

695–96 (Bankr.E.D.Pa.1988). In *Ford,* although the debtor's wife did not technically have a security interest in the funds deposited into the family court by the *Ford* debtor, she did have special rights in the fund, which would have been adversely affected by a turnover. 78 B.R. at 736. Similarly, here, the Tenant does not technically have a security interest in the funds deposited in the escrow account. However, it does have, by the terms of the Lease, a very strong and special interest in the funds which it deposited therein.

Moreover, unlike the debtors in even such cases as *Brooks Shoe Mfg. Co. v. United Telephone Co.,* 39 B.R. 980, 983–84 (E.D.Pa.1984); *Ford;* and *New York City Shoes, supra,* where turnover was denied, the Debtor here was not the depositor of the funds which it seeks to have turned over to it. They were made by the Tenant.

Finally, as we indicate at page 874 *infra,* we determine herein that the Debtor is only entitled to recovery of a portion of these funds. We believe that it would constitute a most unusual interpretation of § 542(a) to require all of the post-petition rents paid into the fund to be turned over to the Debtor in the course of the very Opinion where we determine that the Debtor is only entitled to a portion of them.

We therefore deny the efforts of the Debtor, on each of its attempts to invoke separate Bankruptcy Code sections in support of same in its Complaint, to immediately recover any portion of the sums deposited therein by the Tenant.

7. Applying the Foregoing Legal Principles to the Facts, We Determine that, of the Sum Which we Calculate Should Have Been Deposited into the Account, $100,000.00 is to be Retained to Repay the HVAC System; $148,096.00 is to be Paid to the Debtor; and the Balance is to be Refunded to the Tenant.

a. *The Instant Matter is a Core Proceeding Which We Must Determine.*

Neither party addresses the issue of the nature of this proceeding as core or non-core. We believe that it could be characterized as core on the basis of the counts set forth in the Debtor's Complaint, i.e., a proceeding seeking an order to turn over property to the estate, pursuant to 28 U.S. C. § 157(b)(2)(E), or a proceeding to enforce the automatic stay, which we believe, though not specifically enumerated in § 157(b)(2), is incontestably core, since it depends on the Bankruptcy Code and rights created therein for its existence.

However, since we deny the requested relief of turnover and of enforcement of the automatic stay, this action could be viewed as one concerned only with collection of accounts receivable, some of which are pre-petition and some of which are post-petition. As such, we would be inclined to characterize the proceeding as core in nature. *See In re Jackson,* 90 B.R. 126, 128–31 (Bankr.E.D.Pa.1988); and *In re Windsor Communications Group, Inc.,* 67 B.R. 692 (Bankr.E.D.Pa.1986). Moreover, we are concerned with allocation of property of the estate, which we believe arguably implicates §§ 157(b)(2)(A), (b)(2)(B), (b)(2)(K), and (b)(2)(O).

We shall therefore proceed to determine this proceeding, applying the legal principles which we have formulated heretofore to the Findings of Fact appearing earlier in this Opinion.

b. *The Tenant Should Have Deposited $455,653.00 into the Escrow Account to Date, $233,509.00 Toward Pre–Petition Rents and $222,144.00 Toward Post–Petition Rents.*

Although different statements of the rentals deposited appear at various points in the submissions of the parties, we base our computation on the figures which we computed in Finding of Fact 21, at page 865 *supra.* If less has been deposited, then the residuum which we believe is due to the Tenant will be less.

c. *The $100,000.00 Deposit Which the Court's Expert Indicates Should be Allocated Towards Repairs to the HVAC System are Deducted from Pre–Petition Rentals and Shall be Held in Escrow Pending the Repairs.*

There are two conditions in the premises which we hold sufficiently serious

to entitle the Tenant to abatements in the rent for every month since it took possession of the premises to date:

1. The square footage of the premises is less than that for which the Tenant bargained; and

2. The performance of the HVAC system has been inadequate.

■ We credited the testimony of the Tenant's expert witness, Alan Cohen, that the space rented to the Tenant actually contained between 13 and 14 percent less area than the Lease recited. The Debtor provided absolutely no expert testimony or evidence entitled to any weight to the contrary. While we believe that much of the consequential damages which the Tenant claims as a result, such as lost custom-made furniture expenses and reductions in its student body, were not reasonably foreseeable to the Debtor and hence not compensable, some rebate for loss of space is. We measure the rate of abatement at between 10 and 13 percent of the rent, making the figure on the low side because we are not convinced that the amount of lost space is directly proportionate to the loss of the value of its anticipated tenancy suffered by the Tenant. The Tenant is not making any attempts to relocate; the space provided cannot have been deemed by the Tenant to be inadequate to a great degree.

It is even more difficult to measure the Tenant's rights due to the malfunctioning of the HVAC system. The report and testimony of the court's expert witness, Spielvogel, confirms the already overwhelmingly convincing evidence from the Tenant's witnesses that the system is not working properly. The denials of the Debtor's manager that any problem existed were totally lacking in comparably convincing detail or professional support.

We decide that the Tenant is entitled to a rebate of one-third of the rentals paid into escrow as an abatement for the combination of the reduced area and malfunctioning of the HVAC system. We direct that the fund of $100,000.00 envisioned by Spielvogel's report will be promptly utilized to reimburse him and to repair the system. After the repairs are completed, we shall have Spielvogel inspect the system again. If he pronounces it to be providing reasonably fit HVAC services, we shall reduce the rebate to ten (10%) percent. Without the cumulative effect of the HVAC system malfunctioning and the reduction of space, we believe that this low-side abatement is all that is appropriate.

With respect to the pre-petition rentals, the Tenant is entitled to a rebate of one-third of $233,509.00 or $77,836.33. With respect to post-petition rentals, it is entitled to one-third of $222,144.00 or $74,048.00.

d. *The Other Pre–Petition Claims of the Tenant are Sufficient to Exhaust the Balance of the Portion of the Rental Escrow Attributable to Pre–Petition Rents.*

Deduction of the $100,000.00 set-aside towards repair of the HVAC system, plus the rebate of $77,836.33 from the pre-petition rentals, leaves a residual balance of only $55,672.07 in pre-petition rentals in the escrow fund. We would be inclined to award the Tenant only a portion of the sums sought to install additional outlets, reimburse it for floor and wall covering, and reimburse it for renovations to the bathrooms. We would not allow any other consequential damages. We believe that the figure pegged by Ms. Ounjian for damages for late delivery of the premises, $176,-926.00, is astronomical. Much of the delay in delivery of the first floor of premises was brought on by the Tenant's insistence that the lighting be replaced and replaced immediately. We believe, that, putting aside the Tenant's insistence to replace the lighting would have reduced the delay in delivery of the premises on April 7, 1987, a delay of 37 days in delivery of the first floor occurred rather than the 80 days, as calculated by the Tenant. It also is arguable that the Tenant unconditionally waived 30 days of this late-delivery, irrespective of the poor condition of the alternative first-floor space, reducing the delay to but seven days. The maximum delay in delivery of the second floor claimed by the Tenant is 20 days, although at least a partial delivery of the space occurred earlier. We would

not be inclined to find that there was a delay in delivery which would justify imposition of the liquidated damages in the Lease for more than 27 days. The maximum allowable damages for late delivery would therefore appear to be only about $50,000.00. Therefore, allowing the Tenant to retain the $55,672.07 pre-petition balance is an accurate measurement of the valid pre-petition claims which the Tenant is entitled to set off against the Debtor.

We therefore conclude that, except for the $100,000.00 which shall remain in the escrow account to cover the HVAC system repairs (and also to compensate Spielvogel)[2], the entire pre-petition rental payment balance should be returned to the Tenant. However, if the repairs and the fees chargeable to Spielvogel do not exceed $100,000.00, we recommend that the parties split the remaining difference.

e. *The Debtor is Entitled to Two-Thirds of the Post–Petition Escrow Account Balance and the Tenant is Entitled to the Remainder.*

The amount in the escrow account attributable to post-petition rentals through November, 1988, was previously calculated by us, see Finding of Fact 21, page 865 *supra,* to be $222,144.00. One-third of this sum, or $74,048.00, is to be rebated to the Tenant. The remaining balance of $148,096.00 should be remitted to the Debtor. Any shortages in the account would be attributable to the failure of the Tenant to pay in sums that were due. The Tenant should therefore recover the balance in the account, less the $100,000.00 deposit towards HVAC system repairs, less $148,096.00 which is payable to the Debtor.

We do not envision that the Tenant will make any future payments into escrow. Rather, it should commence remittance of two-thirds of the future rentals due, or $18,512.00 monthly, to the Debtor until the HVAC system is adequately repaired, at which time the rentals should revert to nine-tenths of the sum due under the Lease. Through December, 1989, the rent would become $24,991.20 monthly at that point.

## E. CONCLUSION

An Order consistent with this Opinion will be entered.

## ORDER

AND NOW, this 8th day of November, 1988, after a trial on the above-entitled proceeding on August 3 and 4, 1988, and receipt of a post-trial report and testimony of November 2, 1988, by the court-appointed heating, ventilation, and air-conditioning specialist (hereinafter referred to as "HVAC"), Lawrence G. Spielvogel, Inc. (hereinafter "Spielvogel"), it is hereby ORDERED as follows:

1. The Debtor, TM CARLTON HOUSE PARTNERS, LTD., is directed to repair the HVAC system forthwith in accordance with Spielvogel's recommendations.

2. The sum of $100,000.00 of the amount deposited into escrow in lieu of payment of rentals by the Defendants, CAREER PLANNERS, INC. and CAREER INSTITUTE, INC., shall remain in the account, subject to withdrawal by the Debtor first, to reimburse Spielvogel in the amount of $4,751.50; and second, to repair the HVAC system in the Defendants' space in the Debtor's building.

3. When the Debtor alleges that repairs to the HVAC system have been completed, they shall again be inspected by Spielvogel and he shall make a written report to the court, for which he shall again be compensated from the escrow funds or, if same is exhausted, by the Debtor.

4. The sum of $148,096.00 from the sum deposited into escrow shall be paid to the Debtor.

5. The remainder from the sum deposited into escrow shall be returned to the Defendants.

6. Hereafter, the Defendants shall be required to pay the Debtor two-thirds of the rentals otherwise due, until the HVAC

---

**2.** On November 3, 1988, Spielvogel remitted a bill for $4,751.50 for his services which, being consistent with his quoted billing schedule, we will award to him in the accompanying Order.

system is determined by Spielvogel to be suitably repaired, after which the Defendants shall be required to pay the Debtor nine-tenths of the rentals otherwise due.