**In re Patricia SMITH, Debtor.**

**Patricia SMITH, Plaintiff,**

**v.**

**CITIFED f/k/a the Kissell Company, Defendant.**

**Bankruptcy No. 87–03859S.
Adv. No. 90–0065S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 5, 1990.

Irwin Trauss, Community Legal Services, Inc., Philadelphia, Pa., for plaintiff-debtor.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Jonah D. Levin, Norristown, Pa., for defendant.

## MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

On Thursday, February 1, 1990, the Debtor, PATRICIA SMITH (hereinafter "the Debtor"), filed this adversary proceeding seeking to reinstate the automatic stay, from which we had granted the Defendant, CITIFED MORTGAGE COMPANY (hereinafter "the Defendant"), relief, by Order of September 8, 1989. *See In re Smith,* 104 B.R. 695, 702 (Bankr.E.D.Pa.1989) (hereinafter cited as *"Smith II,"* since we had published a previous Opinion related to this case at 92 B.R. 127 (Bankr.E.D.Pa. 1988), *rev'd in part sub nom. Smith v. Kissell Co.,* 98 B.R. 708 (E.D.Pa.1989)). Our Order of September 8, 1989, in *Smith II* authorized the Defendant to proceed with any applicable state-court remedies in reference to the Debtor's property at 2075 East Victoria Street, Philadelphia, Pennsylvania 19134 (hereinafter "the Premises"). Since the Defendant has scheduled a sheriff's sale of the Premises on February 5, 1990, the Debtor sought a Temporary Restraining Order ("TRO") halting the sale.

The extensive and exhaustive history of this case is set forth in *Smith II,* 104 B.R. at 696–98. We rather reluctantly entered a TRO after a colloquy with opposing counsel on February 1, 1990. We were particularly disturbed that the Debtor had seen fit to wait until the eleventh hour to file this Complaint, when our unappealed *Smith II* Order had been entered almost five months before. The only perceptible change in circumstances since September 8, 1989, appeared to be the issuance of a check by a fire insurer on the Premises,[1] made out

---

1. Fortunately, even though the Debtor failed to pay the post-confirmation insurance premiums, in violation of her obligations under the confirmed Plan of December 13, 1988, *see Smith II,* 104 B.R. at 699, the Defendant had purchased such insurance.

jointly to the Debtor and the Defendant, in the amount of $19,000, as was anticipated would transpire in *Smith II*, 104 B.R. at 699, which has been in the possession of the Defendant since, allegedly, December 15, 1989. No Modified Plan had been filed although, after our Order of September 8, 1989, we would have assumed that the Debtor would have recognized a prompt filing of a Modified Plan as a prerequisite to any further dispensation from this court. *See id.* at 701–02.

We scheduled a preliminary injunction hearing on February 13, 1990. Counsel for the Defendant inexplicably failed to appear and reportedly agreed that the stay could remain in effect until the date of a continued hearing on March 1, 1990. We entered an Order on February 13, 1990, granting a preliminary injunction of the sale and scheduling the trial or final hearing in the proceeding on March 1, 1990.

True to form, the Debtor took no action thereafter until the eleventh hour, when, on February 27, 1990, she filed a motion seeking to continue the trial and engage in expedited (!) discovery. The motion was not brought to our attention until February 28, 1990, the day before trial. We considered it at the time of the trial. At that time, the Debtor's counsel also claimed that the Debtor was unavailable for testimony due to the illness of one of her children. Upon the Debtor's suggestion that only the Defendant's counsel would be able to adduce the admissions that she wanted to obtain from the Defendant's agents through discovery, we indicated that the Defendant's counsel should make himself available for testimony, or a continuance would be granted. With extreme reluctance, the Defendant's counsel agreed to make himself available as a witness at trial. His testimony and the Debtor's testimony from her home by telephone, in addition to several documents received into evidence, constituted the record.

The Defendant's counsel affirmed that the Defendant had possession of the jointly-drawn insurance-payment check and had not reassessed the damages recited in its state-court default judgment of $21,528.08 in preparation for the sale. He also produced a letter from the insurer's adjustor to the Debtor's counsel of January 24, 1990, indicating that the Debtor had not submitted a statement of her Additional Living Expenses despite numerous requests, suggesting that the Debtor herself was responsible for the delay in resolution of the insurance claim.

The Debtor testified that the Premises was uninhabitable and that she was living elsewhere with no intention to return. She nevertheless claimed that the Premises was worth $10,000. Her basic calculation of this figure was that the Premises had been worth about $20,000 prior to the fire, and about half of it was totally consumed in the fire. Although she did not indicate that she had made any efforts to sell the Premises to date, her apparent sole goal of this proceeding was to prevent the sheriff's sale so that she could sell the Premises for what she estimated was its fair market value. At the end of the hearing, the Debtor's counsel presented us with a Motion to file a Modified Plan and a proposed Modified Plan, filed, again true to form, *that day*. The Plan contemplated the Debtor's conveying the Premises to the Defendant for a credit of $10,000 on the mortgage obligation, or allowing the trustee to sell the Premises and crediting the proceeds to the mortgage balance; applying the insurance proceeds to the remaining balance; and remitting any excess over the Defendant's secured claim to the Debtor.

We cannot accept the Debtor's valuation of the Premises at present at $10,000 as anything close to accurate. The market value of a home before a very destructive fire would seem to have little bearing on its salvage value as a partially-burned shell. We find that the actual value of the Premises is negligible.

The standards for allowing the reinstatement, pursuant to 11 U.S.C. § 105(a), of an automatic stay from which relief has been granted has been set down in *In re Wedgewood Realty Group, Ltd.*, 878 F.2d 693, 701 (3d Cir.1989), as follows:

> In order to obtain section 105(a) injunctive relief, the debtor, in accordance with

Bankruptcy Rule 7065 and Fed.R.Civ.P. 65, has the burden of demonstrating to the court the following: [1] substantial likelihood of success on the merits, [2] irreparable harm to the movant, [3] harm to the movant outweighs harm to the nonmovant, and [4] injunctive relief would not violate public interest.

▮ Apart from mechanical application of the four criteria set forth in *Wedgewood*, we believe that it must be recalled that any relief granted under § 105(a) is extraordinary, and may be provided only when all of the equities are in the proper constellation. We submit that two of the most important general equitable considerations are (1) the manner in which relief from the automatic stay was granted in the first place; and (2) the timeliness of the request for relief. Thus, if the order for relief is granted by operation of § 362(e), only due to the failure of the court to schedule or decide a § 362(d) motion, relief may readily be granted even if the debtor's satisfaction of the other criteria is relatively weak. If the debtor serves a request for reconsideration within ten days after the order granting relief under § 362(d) is entered, a plenary reconsideration of the order may be appropriate. *Cf. Smith v. Evans*, 853 F.2d 155, 157–62 (3d Cir.1988); and *In re Dinh*, 90 B.R. 743, 745 (Bankr.E.D.Pa.1988) (service of a motion to reconsider any order within ten days of the entry of the order, pursuant to Bankruptcy Rule 9023 and Federal Rule of Civil Procedure 59(e), allows plenary reconsideration). If a delay results in a creditor's incurring fees and costs, these should normally be imposed as a condition for relief, assuming that the presence of such costs does not constitute a sufficient basis to deny relief entirely. *Cf. Noble v. Yingling*, 37 B.R. 647, 651 (D.Del.1984); and *In re Davidson*, 36 B.R. 539, 545 (Bankr.D.N.J.1983) (costs incurred by creditor as a result of delays by debtor imposed as a condition for allowing a motion to reopen a case to be granted).

The first of the four criteria set forth in *Wedgewood* seems out of place removed from the context from which it was apparently drawn, *i.e.*, the requirements for granting a preliminary injunction. *See, e.g., Fechter v. HMW Industries, Inc.*, 879 F.2d 1111, 1116 (3d Cir.1989); and *In re University Medical Center*, 82 B.R 754, 756 (Bankr.E.D.Pa.1988). In the context of two post-*Wedgewood* decisions involving Chapter 11 business-debtors, Judge Fox has suggested that this first criterion is met in the context of seeking reinstatement of a stay if the debtor has a reasonable probability of confirming a plan of reorganization, *see In re Sovereign Group 1985–27, Ltd.*, Bankr. No. 89–10721F, slip op. at 3 (Bankr.E.D.Pa. Oct. 27, 1989), or if the debtor can establish that the secured party is adequately protected even if the § 362(d) order is vacated. *See In re Tudor, Tudor v. Chemical Bank of New Jersey*, Bankr. No. 89–12746F, Adv. No. 89–0841F, slip op. at 8 (Bankr.E.D.Pa. Nov. 27, 1989).

The other three criteria, a balancing of the relative hardships of the parties and the public interest, including the interest of other creditors, are easily understandable.

▮ In weighing all of these considerations, we begin by observing that the Debtor fares badly in the assessment of the two general equitable considerations. The motion which resulted in our Order of September 8, 1989, was filed on August 2, 1989. It was not only not due to any scheduling errors or delays by the court, but only after complete briefing and the issuance of a published Opinion. Such extensive treatment of a motion under § 362(d) is very unusual. Having given the matter such intense consideration, we are distinctly disinclined to alter our result lightly, unless there has been a substantial change of circumstances. We find no significant changes of circumstances.

The Debtor also fares badly on the issue of the timeliness of the filing of this proceeding. The facts are not very different than they were in September, except that the Debtor appears to have stabilized her household in another residence, and the anticipated insurance payment has in fact arrived. Unfortunately, the disposition of the insurance check is presently stalemated, as each party needs the signature of

the other to negotiate it and the parties do not seem very far along in resolving how the check is to be allocated. However, we are not prepared to lay all of the blame on the Defendant. The Debtor has apparently delayed in remitting a claim for Additional Living Expenses.

In the context of a Chapter 13 case, the important considerations related to the "likelihood of success on the merits" criterion would seem to be the feasibility of the debtor's plan as confirmed or modified and the potential for the plan, if confirmed, to adequately protect the creditor concerning which reinstatement of the stay is requested.

We question whether the Debtor meets this criterion. The feasibility of the Debtor's belatedly forthcoming Modified Plan appears largely based on the unlikely prospect that the Premises is worth $10,000. With only the Debtor's frankly poor quality estimate of a value which we consider egregiously optimistic as the only basis for this conclusion, we are very skeptical that this long-gestating Modified Plan could be confirmed. We also doubt that the Defendant's interests are adequately protected by a Modified Plan in which it is provided that the Defendant must give the Debtor $10,000 credit for the Premises, which we deem to be of negligible value.

We are also unmoved here by the allegation that reinstatement of the stay is necessary to avert irreparable harm to the Debtor. This is perhaps the singly most important criteria, because we are inclined to grant such relief when denial of same would result in a low or moderate income family's loss of their home. Furthermore, this is often the easiest of the criteria for a consumer-debtor seeking to reinstate the automatic stay in the face of a foreclosure sale to satisfy. However, here, the Debtor is *not* seeking to retain her home. The Premises, to the extent that it has any value, is presently like an "investment property" of the Debtor, the proceeds from the sale of which the Debtor hopes to turn into cash. To the extent that the Debtor might be entitled to a monetary recovery against the Defendant for the manner in which it disposes of the Premises, the damages would be merely monetary and not irreparable. Furthermore, any damages are readily collectible out of the proceeds of the check, which the Defendant cannot negotiate without the Debtor's cooperation.

The instant action appears to be interposed principally for delay. If the Debtor had a clear cause of action against the Defendant for its method of handling the checks, we believe that she would undoubtedly have raised same prior to the eleventh hour here, or in state court. There is undoubtedly harm to both the Defendant from any delay in the necessity to re-invest the costs of sale. The public interest would be served by a proceeding which will tend to eliminate as soon as possible the eyesore that we suspect the vacant Premises has become.

Therefore, none of the relevant equitable factors nor the four *Wedgewood* criteria are in the Debtor's favor. Furthermore, we are not certain what practical benefit the Debtor hopes to accomplish by this latest maneuver. We suspect that there is no market for the Premises, because, if there were, the Debtor would have obtained a buyer for it in the period of over a year since the fire. There are some difficult issues regarding dispositions of the insurance proceeds if the parties are unable to resolve this dispute amicably. However, since the Debtor is a drawee of the proceeds check, there is no way that the Defendant can dispose of it without her cooperation. This dispute should be relegated to the state courts, as was the effect of our Order of September 8, 1989.

We therefore conclude that the Debtor cannot possibly prevail in the main thrust of this action. We note that, secondarily, the Debtor avers that the Defendant is violating the automatic stay by retaining the check. We reject this claim for two reasons. First, the disposition of this check appears to be within the scope of matters "in reference to" the Premises, concerning which we granted relief on September 8, 1989, and which result we decline to alter here. Secondly, the Defendant is merely serving as custodian of a check

which is worthless unless and until both drawees agree to negotiate it. Whether the check is in the possession of the Defendant or the Debtor or some third party is of no great significance. A trivial or technical violation of the stay is not actionable. *See Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84–85 (3d Cir. 1988). A refusal to turn over the proceeds of a disputed claim to a debtor is not a violation of the automatic stay, but merely creates a potential post-petition obligation of the holder of the property to the debtor. *See In re TM Carlton House Partners, Ltd.*, 93 B.R. 859, 870 (Bankr.E.D.Pa.1988).

Having concluded that the Debtor is clearly not entitled to any relief, it would be wasteful of the scarce resources of this court and the parties to require and review the briefing which we indicated we would be receptive to obtaining from the parties in the event we were unable to resolve the matter by 2:00 P.M. on March 5, 1990, the date and time of the next scheduled sheriff's sale. We *are* able to make this decision before that date and time and we do so.

We also are concerned about the future of the underlying main bankruptcy case. The Debtor is not performing in accordance with her confirmed Plan. Her proposed Modified Plan appears infeasible in any event and will certainly be so if the sheriff's sale goes through. Therefore, we will instruct the Chapter 13 Trustee to investigate whether this case should be dismissed under 11 U.S.C. §§ 1307(c)(1), (c)(6), or (c)(7), and, if so, to file an appropriate motion. Otherwise, we fear that there will be continuous future efforts to draw this court back into disputes which we meant to relegate to the state courts in our Order of September 8, 1989.

### ORDER

AND NOW, this 5th day of March, 1990, after a final hearing or trial of the above-captioned proceeding on March 1, 1990, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Defendant, CITIFED f/k/a THE KISSELL COMPANY, and against the Plaintiff and Debtor, PATRICIA SMITH.

2. The Complaint is DISMISSED.

3. The preliminary injunction of February 13, 1990, enjoining the Defendant from proceeding with the sheriff sale of 2075 East Victoria Street, Philadelphia, Pennsylvania, is DISSOLVED.

4. The Chapter 13 Trustee shall promptly investigate whether the Debtor's main bankruptcy case should be dismissed pursuant to 11 U.S.C. §§ 1307(c)(1), (c)(6), (c)(7), and, if so, file an appropriate motion.